UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KENT WILLIAMS,<br><br>                Plaintiff,<br><br>    v.<br><br>ASSOCIATE WARDEN McKAY;<br>DEFENDANT MORRISON;<br>WARDEN CHRISTENSEN;<br>DEFENDANT ZUDAK; WARDEN<br>BLADES; MORGAN KEVAN;<br>KELSEY HOWARD; DEFENDANT<br>RADZYMINSKI; LT. LAV;<br>DEFENDANT BROTHER;<br>ASSISTANT WARDEN DIETZ;<br>DEFENDANT KLINGENSMITH; LT.<br>HUSK; C/O BAKER; DEFENDANT<br>CHAPPELE; DEFENDANT OLSEN;<br>DEFENDANT HELD; DEFENDANT<br>SANABARIA; DEFENDANT<br>TRAMEL; DEFENDANT WHITE;<br>DEFENDANT FRAHS; DEFENDANT<br>JANOUSHEK; and DEFENDANT<br>CONTRERAS,<br><br>                Defendants. | Case No. 1:20-cv-00008-BLW<br><br>**INITIAL REVIEW ORDER BY<br>SCREENING JUDGE** |

The Clerk of Court conditionally filed Plaintiff Kent Williams's Complaint as a result of Plaintiff's status as an inmate and in forma pauperis request. The Court now reviews the Complaint to determine whether it or any of the claims contained therein should be summarily dismissed under 28 U.S.C. §§ 1915 and 1915A. Having reviewed the record, and otherwise being fully informed, the Court enters the following Order.

## 1. Screening Requirement

The Court must review complaints filed by prisoners seeking relief against a governmental entity or an officer or employee of a governmental entity, as well as complaints filed in forma pauperis, to determine whether summary dismissal is appropriate. The Court must dismiss a complaint or any portion thereof that states a frivolous or malicious claim, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. §§ 1915(e)(2)(B) & 1915A(b).

## 2. Pleading Standard

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint fails to state a claim for relief under Rule 8 if the factual assertions in the complaint, taken as true, are insufficient for the reviewing court plausibly "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In other words, although Rule 8 "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (internal quotation marks omitted). If the facts pleaded are "merely consistent with a defendant's liability," or if there is an "obvious alternative explanation" that would not result in liability, the complaint has not stated a claim for relief that is plausible on its face. *Id.* at 678, 682 (internal quotation marks omitted).

### 3.     Substantive Standards of Law Governing Plaintiff's Claims

Plaintiff is a prisoner in the custody of the Idaho Department of Correction ("IDOC"), currently incarcerated at the Idaho State Correctional Center ("ISCC"). He brings his claims under 42 U.S.C. § 1983, the civil rights statute.

To state a plausible civil rights claim, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To be liable under § 1983, "the defendant must possess a purposeful, a knowing, or possibly a reckless state of mind." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472 (2015). Negligence is not actionable under § 1983, because a negligent act by a public official is not an abuse of governmental power but merely a "failure to measure up to the conduct of a reasonable person." *Daniels v. Williams*, 474 U.S. 327, 332 (1986).

Prison officials generally are not liable for damages in their individual capacities under § 1983 unless they personally participated in the alleged constitutional violations. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Iqbal*, 556 U.S. at 677 ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). Section 1983 does not allow for recovery against an employer or principal simply because an employee or agent violated the Constitution. *Taylor*, 880 F.2d at 1045.

However, "[a] defendant may be held liable as a supervisor under § 1983 'if there exists ... a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting

*Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). A plaintiff can establish this causal connection by alleging that a defendant (1) "set[] in motion a series of acts by others"; (2) "knowingly refus[ed] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury"; (3) failed to act or improperly acted in the training, supervision, or control of his subordinates"; (4) "acquiesc[ed] in the constitutional deprivation"; or (5) engag[ed] in "conduct that showed a reckless or callous indifference to the rights of others." *Id*. at 1205-09.

Defendants who were involved in reviewing claims in the administrative grievance process may or may not have liability for the constitutional violations complained of regarding the grievances they processed, depending upon (1) the type and timing of problem complained of and (2) the role of the defendant in the process. For example, a grievance appeals coordinator cannot cause or contribute to a completed constitutional violation that occurred in the past and that is not remediable by any action the reviewer might take. *See, e.g., George v. Smith*, 507 F.3d 605, 609–610 (7th Cir. 2007) ("A guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not"). If, however, the defendant "knew of an ongoing constitutional violation and … had the authority and opportunity to prevent the ongoing violation," yet failed to act to remedy the violation, then the defendant may be liable under § 1983. *See Herrera v. Hall*, 2010 WL 2791586 at *4 (citing *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

A claim that a supervisor or training official failed to adequately train subordinates ordinarily requires that, "in light of the duties assigned to specific officers or employees[,] the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the [supervisor or training official] can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). That is, to maintain a failure-to-train claim, a plaintiff must allege facts showing a "pattern of violations" that amounts to deliberate indifference. *Connick v. Thompson*, 563 U.S. 51, 72 (2011).

Likewise, "a failure to supervise that is sufficiently inadequate may amount to deliberate indifference" that supports a § 1983 claim, but there generally must be a pattern of violations sufficient to render the need for further supervision obvious. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (internal quotation marks omitted). That is, if a supervisory or training official had "knowledge of the unconstitutional conditions" through such a pattern of violations—including knowledge of the "culpable actions of his subordinates"—yet failed to act to remedy those conditions, that official can be said to have acquiesced "in the unconstitutional conduct of his subordinates" such that a causal connection between the supervisor and the constitutional violation is plausible. *Starr*, 652 F.3d at 1208.

Prisoners do not forfeit all of their constitutional rights simply because they are prisoners. However, many constitutional rights are appropriately restricted within prison walls, and "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our

penal system." *Bell v. Wolfish*, 441 U.S. 520, 545–46 (1979) (internal quotation marks omitted).

In *Turner v. Safley*, 482 U.S. 78 (1987), the United States Supreme Court outlined the legal standard governing most claims of incarcerated individuals. In that case, the Court examined a First Amendment issue in the context of prison officials prohibiting correspondence between inmates residing at different state institutions.

The *Turner* Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. The Court identified four factors to consider when determining whether such a regulation is valid: (1) whether there is a "rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether "there are alternative means of exercising the right that remain open to prison inmates"; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether "ready alternatives" at a "de minimis cost" exist, which "may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Id.* at 89–93.

The *Turner* analysis appropriately allows prison officials substantial leeway in the management of their prisons because "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Id.* at 89. Federal courts must apply the *Turner* test in a way

that "accord[s] great deference to prison officials' assessments of their interests." *Michenfelder v. Sumner*, 860 F.2d 328, 331 (9th Cir. 1988).

In this case, Plaintiff challenges actions by various prison officials, regarding Plaintiff's use of language in the course of the prison grievance process, on numerous occasions in 2018 and 2019. As this Court has previously stated, a "free speech analysis of language uttered by inmates necessarily depends on its context—written or unwritten, grievance or non-grievance." *Williams v. Brooks*, No. 1:17-CV-00223-DCN, 2018 WL 2069708, at *3 (D. Idaho May 3, 2018) (unpublished). Therefore, Plaintiff "does not have a freestanding free speech claim that is separate from its context." *Id*. (emphasis omitted).

Instead, Plaintiff's § 1983 claims are best construed as asserting violations of the following First Amendment rights: (1) the right to petition the government for redress, (2) the right to be free from retaliation for engaging in protected conduct, and (3) the right to use the mail in prison.

### A.    *Right to Petition the Government for Redress*

The First Amendment to the United States Constitution includes the right to petition the government for redress of grievances. The right to petition applies to incarcerated individuals and includes the right to use a prison grievance process, if such a process exists. *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995), *abrogated on other grounds by Shaw v. Murphy*, 532 U.S. 223, 230 n.2 (2001). The Ninth Circuit has determined that prisoners have a right to use disrespectful language in prison grievances. *See id*. at 1281–82; *Richey v. Dahne*, 733 F. App'x 881, 883–84 (9th Cir. April 25, 2018)

(unpublished). However, this right is not unqualified. *See Bell*, 441 U.S. at 545

("[S]imply because prison inmates retain certain constitutional rights does not mean that

these rights are not subject to restrictions and limitations.").

In *Bradley*, the Ninth Circuit stated broadly that "prison officials may not punish

an inmate merely for using 'hostile, sexual, abusive or threatening' language in a written

grievance." *Id*. at 1282. Similarly, in *Brodheim v. Cry*, the court held that a defendant's

warning to an inmate about what the inmate writes in a grievance "cannot escape

constitutional scrutiny by citing a legitimate penological interest." 584 F.3d 1262, 1273

(9th Cir. 2009). But in the decade or decades since those cases, courts—including the

Ninth Circuit—have circumscribed these broad pronouncements in a number of

important respects.

First, frivolous grievances do not qualify as petitions for redress and, therefore, are

not protected by the First Amendment. *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir.

2015) ("Prisoners' grievances, unless frivolous, concerning the conditions in which they

are being confined are deemed petitions for redress of grievances and thus are protected

by the First Amendment.") (internal quotation marks omitted). Therefore, although this

Court's review of the ultimate constitutionality of a prison policy under *Turner* must be

content-neutral, *see Shaw*, 532 U.S. at 230, the Court still must consider the content of

the grievance to determine, as a threshold matter, whether the grievance is frivolous or, in

fact, constitutes a petition for redress. Because frivolous grievances are not protected

petitions for redress, and because negligence is insufficient to state a constitutional claim

under § 1983, *see Kingsley*, 135 S. Ct. at 2472, a prison official who refuses to process a

grievance that the official subjectively—even if mistakenly—believed was frivolous, then that defendant, having acted only negligently, has not violated the prisoner's right to petition the government for redress.[1]

Second, prison "grievances that are nothing more than a string of insults do not constitute substantive grievances." *Williams v. Stewart*, Case No. 1:18-cv-00343-DCN, Dkt. 9 at 10 n.2 (D. Idaho April 15, 2019) (unpublished). Therefore, such grievances "also fail to qualify as protected petitions for redress under the First Amendment." *Id.*

Third, a grievance that is intended solely to harass prison staff, "rather than designed to lead to any practical result," is not protected by the First Amendment. *See Debarr v. Clark*, 648 F. App'x 706, 708 (9th Cir. April 18, 2016) (unpublished). Such unprotected writings include grievances that are "frivolous, vexatious[,] or duplicative." *Id.*

Fourth, the First Amendment does not protect an inmate's verbal or written threats against prison staff. *Brodheim*, 584 F.3d at 1273. That is, inmates may be disciplined—or their grievances rejected without action—if language in a written grievance poses "a substantial threat to security and discipline" at the prison.[2] *Id.* As this Court has

---

[1] Such action by the prison official would, however, excuse the plaintiff from the exhaustion requirement of 42 U.S.C. § 1997e(a), because the grievance process was effectively unavailable to the plaintiff. *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016) (stating that an inmate must exhaust "those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'") (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001).

[2] *See, e.g., Helm v. Hughes*, 2011 WL 476461, at *9 (W.D. Wash. Jan. 6, 2011) (unpublished) (finding that language of "abuse is violence, violence begets violence" was a threat that satisfied the *Turner* standard), *report and recomm'n adopted*, 2011 WL 462567 (Feb. 4, 2011). *Cf. In re Parmelee*, 63 P.3d 800 (Wash. Ct. App. 2003) (rejecting *Bradley* as nonbinding precedent on a state court and finding it appropriate under *Turner* and the First Amendment for prison officials to punish inmate for writing threats in grievances: "Fire this asshole before someone reacts to his attempt to provoke violently, correct

previously explained, disciplining inmates for threatening staff is reasonably related to the legitimate penological interest in protecting prison staff. *Hill v. Wamble-Fisher*, No. 1:11-cv-00101-REB, 2013 WL 3223634, at *1 (D. Idaho June 24, 2013) (unpublished) (holding that (1) dismissal of retaliation claim based on discipline for the content of a grievance was appropriate because the grievance "contained a threat, referring to assaulting and abducting a female staff member by hitting her with a club and dragging her back to his cell"; (2) "[p]rotecting prison staff against threats by prisoners is unquestionably a legitimate penological interest"; and (3) "issuing a [disciplinary offense report] to discourage such behavior is reasonably related to that interest").

Fifth, although the Ninth Circuit Court of Appeals has not yet found a legitimate penological interest that supports policies prohibiting merely *disrespectful*, as opposed to harassing or threatening, language in prison grievances, *see Brodheim*, 584 F.3d at 1273; *Richey*, 733 F. App'x at 884, that court has recognized that a state may have "non-content-based legitimate penological reason[s]" for "contrain[ing] the expression of prisoners" in the context of prison grievances, such as "avoiding hostilities or potential violence." *Richey*, 733 F. App'x at 883.

Sixth, the Ninth Circuit has held that the First Amendment's protection of disrespectful language in prison "relates *only* to the narrow category of cases dealing with prison grievances." *Id.* at 884. (emphasis added). Therefore, if an inmate uses disrespectful language in some other context—such as in a frivolous, vexatious, or

---

this door problem immediately," and, "Fire this asshole before someone reacts to his attem[pt] to provoke violently.").

duplicative writing that does not qualify as a right to petition for redress, in a purported "grievance" that is nothing more than a string of insults, or in a grievance intended solely to harass—then the government may indeed have "legitimate penological concerns related to the security of guards and the desirability of maintaining harmonious relationships between guards and prisoners to the extent possible." *Id.*

Seventh, although a prison grievance's progression through the administrative process cannot be stopped entirely based solely on disrespectful language, the right to petition is not violated if a prison official merely *returns* the grievance to the inmate or asks the inmate to rewrite it in a more appropriate manner. This is because prison officials have a legitimate penological interest in "maintaining good relations between prisoners and guards." *Richey*, 733 F. App'x at 883; *see also id.* ("[T]he violation here occurred when Dahne *refused to allow the grievance to proceed* through the administrative process ….") (emphasis added). That is, an official action that simply returns the grievance to an inmate does not violate the right to petition, but an official action that stops the grievance process—such as an outright refusal to accept a grievance—does.

Finally, *Bradley* held that a prison policy prohibiting disrespectful language was facially constitutional. *Bradley*, 64 F.3d at 1280–81. Therefore, a prisoner may not state a plausible right-to-petition claim merely by citing such a policy. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge … is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which [the challenged policy] would be valid."). Instead, a

prisoner challenging such a policy must plausibly allege that the policy, *as applied*, violates the First Amendment—that is, that the policy fails the *Turner* test as applied to Plaintiff's specific claims.

### B.    *Right to Be Free from Retaliation for Engaging in Protected Conduct*

The First Amendment also includes the right to be free from retaliation for exercising constitutional rights. An inmate asserting a retaliation claim must show the following: "(1) ... that a state actor took some adverse action against the inmate (2) because of (3) that prisoner's protected conduct, ... that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) [that] the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).

"[B]are allegations" of a retaliatory motive are insufficient to support a retaliation claim. *Rizzo v. Dawson*, 778 F.2d 527, 532 n.4 (9th Cir. 1985); *see also Wood v. Yordy*, 753 F.3d 899, 905 (9th Cir. 2014) ("We have repeatedly held that mere speculation that defendants acted out of retaliation is not sufficient."). Rather, when analyzing a prison official's proffered reasons for allegedly retaliatory conduct, the Court must "afford appropriate deference and flexibility" to that official. *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (internal quotation marks omitted).

Not every retaliatory act taken by an official can be considered an adverse action that chills the exercise of protected speech. The proper inquiry asks whether the official's action "would chill or silence a person of ordinary firmness from future First Amendment

activities." *Mendocino Envt'l Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (internal quotation marks omitted).

A plaintiff asserting a retaliation claim under § 1983 also "must show a causal connection between a defendant's retaliatory animus and [the plaintiff's] subsequent injury." *Hartman v. Moore*, 547 U.S. 250, 259 (2006) (*Bivens* action). Retaliatory motivation is not established simply by showing an adverse action by the defendant *after* protected speech. Instead, the plaintiff must show a nexus between the two. *Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (stating that a retaliation claim cannot rest on "the logical fallacy of *post hoc, ergo propter hoc*, literally, 'after this, therefore because of this'"). Therefore, although the timing of an official's action can constitute circumstantial evidence of retaliation—if, for example, an adverse action was taken shortly after the official learned about an inmate's exercise of protected conduct—there generally must be something more than mere timing to support an inference of retaliatory intent. *Pratt*, 65 F.3d at 808.

The causal nexus requirement of a retaliation claim is a "but-for" causation test. If the adverse action would have been taken even without the inmate's exercise of protected conduct, the plaintiff cannot satisfy the causation element of the retaliation claim. *Hartman*, 547 U.S. at 260.

Finally, even if an inmate proves that his protected conduct was the but-for cause of an adverse action by a prison official, the inmate's retaliation claim fails so long as that action also reasonably advanced a legitimate penological interest. The state unquestionably has a legitimate interest in maintaining institutional order, safety, and

security in its prisons, *Rizzo*, 778 F.2d at 532, and the "plaintiff bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains," *Pratt*, 65 F.3d at 806.

### C.     Right to Use the Mail

Inmates enjoy a First Amendment right to send and receive mail. *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). Once again, however, a prison or jail may adopt regulations or practices that impinge on a prisoner's First Amendment rights if those regulations are "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. Specific allegations that mail delivery was delayed for an inordinate amount of time are sufficient to state a claim for violation of the First Amendment. *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996). A temporary delay in the delivery of mail resulting from a prison's security inspection, however, does not violate a prisoner's First Amendment rights. *Crofton v. Roe*, 170 F.3d 957, 961 (9th Cir. 1999).

## 4.     Discussion

### A.     The IDOC Grievance Policy

The prison grievance process at issue in this case is set forth in IDOC's Standard Operating Procedure ("SOP") 316.02.01.001, entitled "Grievance and Informal Resolution Procedure for Offenders." The Court takes judicial notice of the current version of that SOP, which is available on the website of the IDOC at http://forms.idoc.idaho.gov/WebLink/0/edoc/281409/Grievance%20and%20Informal%20Resolution%20Procedure%20for%20Inmates.pdf. *See* Fed. R. Evid. 201; *Driggers v. Beck*, No. 1:10-cv-00182-EJL, 2012 WL 3731783, at *1 (D. Idaho Aug. 28, 2012)

("[W]hen a court is considering a motion to dismiss [or screening a complaint under §§ 1915 and 1915A], it may take judicial notice of matters of public record ….").

The grievance process consists of three stages. First, any inmate with a concern must first seek an informal resolution by filling out an offender concern form addressed to "the appropriate staff member." IDOC SOP 316.02.01.001 at 7. Concern Forms are on colored carbonless copy paper, so that an inmate who submits a concern form can retain a copy of the concern form for his or her records. *Id*. ("[The pink] copy is returned to the offender after a staff member signs it. It is the offender's proof that the staff member took receipt of the form."). A staff member should answer the form within seven days. *Id*. at 3.

Second, if the issue cannot be resolved informally through the use of a concern form, the inmate must then file a grievance form. *Id*. at 8–9. A copy of the concern form must be attached to the grievance. If the staff member did not respond to the concern form, the inmate must write "no response" on the inmate's pink copy of the concern form and attach that copy to the grievance. *Id*. The assigned staff member should respond to the grievance within 14 days, and a reviewing authority should review that response within 16 days thereafter. *Id*. at 12–13. The fully-answered grievance is then returned to the inmate.

Third, if an inmate is not satisfied with the response to a grievance, the inmate may appeal that response by submitting a grievance appeal form. A grievance appeal must be submitted within 14 days of the denial of the grievance. *Id*. at 8–9.

Prison staff are "prohibited from reprisal or retaliation against any" inmate who uses the grievance process. IDOC SOP 316.02.01.001 at 9–10. But, "if an investigation

or staff observation (that is independent of the filed concern or grievance) determines that the offender violated IDOC rules, the offender can be held accountable in accordance with SOP 318.02.01.001, *Disciplinary Procedures: Offender.*" *Id.* at 10.

As relevant to Plaintiff's claims in the instant case, the grievance policy provides as follows:

> Offenders must also refrain from using concern and grievance forms to harass or intimidate a staff member. If the language used in a concern or grievance form could constitute harassment or intimidation, the concern or grievance form will be returned unanswered to the offender along with a note indicating that the form can be resubmitted if written respectfully and/or appropriately.

*Id.* at 7. Further, "offender personal attacks on staff (e.g., the use of profanity or name-calling), or harassment of staff will be cause for staff to not accept" a concern form, grievance form, or grievance appeal form. *Id.* at 8. If a staff member returns or refuses to accept a form pursuant to these provisions, that action does not "constitute an offender using a 'no response' action … to begin the grievance process." *Id.* at 7.

### B.  The Complaint States Plausible Right-to-Petition and Interference-with-Mail Claims

On January 10, 2018, Plaintiff submitted a concern form that complained of a correctional officer entering a C-note into Plaintiff's electronic file.[3] *Compl.*, Dkt. 2, at 3. Although it is not clear to whom the form was addressed, Plaintiff states that Associate

---

[3] "C-Notes" are "chronological notes of IDOC staff contacts with an inmate" that are kept as part of the IDOC's inmate database. *Mennick v. Smith*, No. CV08-161-S-BLW, 2010 WL 996478, at *2 (D. Idaho Mar. 16, 2010) (unpublished); *see also Idaho Dep't of Health & Welfare v. Doe*, 396 P.3d 695, 699 (Idaho 2017) (describing C-notes as "electronic entries in an inmate's file that reflect minor rule violations or behavior that staff wants to keep an eye on") (internal quotation marks omitted).

Warden McKay returned the concern form to Plaintiff, rejecting it for "uncivil language." *Id*. at 4. Plaintiff also alleges that McKay "stopped the grievance process" on that issue by issuing a "No Answer" action on the concern form. *Id*. Plaintiff does not allege that McKay merely returned the form to be rewritten, which would have been constitutionally permissible. Therefore, Plaintiff may proceed on his right-to-petition claim with respect to this concern form.

On January 12, 2018, Plaintiff sent a concern form in an attempt "to grieve a medical issue"; Defendant McKay returned the concern form to Plaintiff because it contained disrespectful language. Plaintiff does not indicate whether he rewrote the concern form, as policy permits, or whether McKay's action stopped the grievance process entirely. *Id*. Therefore, Plaintiff has not stated a plausible right-to-petition claim as to this concern form, because merely returning the concern form does not violate the First Amendment. *See Richey*, 733 F. App'x at 883.

On January 14, 2018, Plaintiff's request for an inmate account statement was denied because Defendant McKay perceived it "to contain disrespectful language." *Compl*. at 5. Plaintiff's request for the statement was not a concern form, grievance form, or grievance appeal form. Therefore, Plaintiff's disrespectful language in this instance was outside the "narrow category of cases dealing with prison grievances" and is not protected by the First Amendment right to petition for redress. *Richey*, 733 F. App'x at 884.

In February 2018, "after the ISCC grievance coordinator, Emily Morrison, refused to process … several grievances … due to language she deemed to be harassing and/or

personal attacks," Plaintiff complained and provided citations to federal court cases regarding the issue of disrespectful language in prison grievances. *Compl*. at 4. Morrison replied, "I have been told to follow policy 316.02.01.001." *Id*. Allegedly, Morrison later "admitted that following such a policy is not a legal defense" and told Plaintiff, "you and everyone else knows every Idaho Judge is going to protect us, they never rule against us." *Id*. Plaintiff states that Morrison "continued to reject grievances that she deemed to contain disrespectful language," but he does not provide any allegations as to what these grievances said. *Id*. at 5. Therefore, Plaintiff has not plausibly alleged that the grievances were nonfrivolous, meaning that he has not alleged that these grievances actually constituted protected petitions for redress.[4] *See Jones*, 791 F.3d at 1035; *Debarr*, 648 F. App'x at 708.

On May 3, 2018, Plaintiff sent Warden Christensen a concern form complaining that ISCC staff were rejecting grievances for illegal reasons. The concern form stated Plaintiff's belief that Christensen "is a 'stupid fuck,' look up [Richey]." *Compl*. at 5 (alteration in original). Defendant McKay "returned the [concern form]" and stated, "you can rewrite this appropriately if you'd like a response." *Id*. Because such action does not violate the right to petition, Plaintiff may not proceed on his claim with respect to this concern form.

---

[4] Plaintiff's contention that "it is not [his] onus to prove [a grievance] wasn't frivolous" is incorrect. *See Compl*. at 8. As the party bringing the claim and bearing the burden of proof, Plaintiff must plausibly allege that his First Amendment right was violated. Because that amendment does not protect language used in frivolous grievances, it is indeed Plaintiff's burden to describe the content of the grievance at issue to plausibly allege that the grievance constitutes a petition for redress, e.g., that it was nonfrivolous.

On April 11, 2018, Plaintiff "attempted to grieve Morrison's notion [that] you can harass a person in a grievance." *Id.* at 6. The concern form to Morrison stated, "How the fuck can I harass a staff member in a grievance sent to you if the complained about Puke … does not see the grievance … have you stopped to think about that?" Defendant McKay intercepted the grievance, gave a "no response," and "kill[ed] the grievance." *Id.* Plaintiff may proceed on his right-to-petition claim as to this concern form.

On May 16, 2018, Plaintiff sent a concern form to Defendant Sergeant Zudak, complaining of unidentified staff members' rejections of Plaintiff's outgoing legal mail. Zudak returned the form, informing Plaintiff that he "need[ed] to address staff appropriately." *Id.* Though Plaintiff states that, because of the return of the concern form, he "couldn't grieve" the mail issue, he does not allege that he rewrote the concern form as Zudak requested. Zudak's act of returning the concern form with a request for appropriate language is permitted both by prison policy and by Ninth Circuit case law, and Plaintiff may not proceed on his right-to-petition claim as to this concern form.

In May 2018, Plaintiff submitted a concern form to Warden Christensen stating, "can you train your inbred idiots? To stop reissuing [food] trays and food [not on tray] they issue to other cells and then retrieve after being in another inmates [sic] cell?" *Id.* (first and second alterations in original). On May 30, Christensen returned the concern form to Plaintiff, stating, "you may resubmit with appropriate language." *Id.* Plaintiff did not rewrite the grievance, and states that the "grievance was killed," but—once again— Christensen was well within constitutional bounds in requesting a rewritten concern form.

In October 2018, Plaintiff submitted a post-conviction petition to the ISCC paralegal for copying. The paralegal returned the document to Plaintiff stating that it was not an access-to-courts issue. *Id.* at 7. Plaintiff submitted a concern form stating, "you fucking idiot. How is my post conviction not an access to courts issue? Its [sic] my petition fucking copy it you fucking idiot." *Id.* Associate Warden McKay intercepted the concern form and "gave a no reply." *Id.* Plaintiff will be allowed to proceed on this right-to-petition claim at this time.

On January 11, 2019, grievance coordinator Morgan Kevan returned some grievances to Plaintiff unprocessed because the grievances were not accompanied by copies of concern forms. *Id.* Plaintiff may not proceed on this right-to-petition claim because Kevan did not base the decision not to process the grievances on the language Plaintiff used. Though Plaintiff contends that he was unable to attach copies of concern forms because staff members had not answered them due to Plaintiff's disrespectful language, Plaintiff does not explain why he did not attach his own (pink) copies of the concern forms as required by prison policy. He may not proceed on this right-to-petition claim.

On February 16, 2019, Defendant Howard allegedly returned a grievance without processing "for the sole reason" that it "was not written in a civil manner." *Id.* at 8. Once again, merely returning a grievance to an inmate is not a violation of the right to petition for redress. *Richey*, 733 F. App'x at 883. Further, Plaintiff has not plausibly alleged that this grievance was nonfrivolous. Thus, Plaintiff may not proceed on this right-to-petition claim.

On February 22, 2018, Defendant Morrison rejected a grievance as a personal attack or as harassment. *Compl.* at 8. Because Plaintiff does not describe the content of the grievance, he has not plausibly alleged that it was nonfrivolous.

On March 23, 2018, Warden Christensen "refused to answer a grievance appeal" but stated that the "appeal 'can be resubmitted if rewritten.'" *Id.* Plaintiff may not proceed on this right-to-petition claim. *See Richey*, 733 F. App'x at 883.

On August 25, 2019, Plaintiff submitted a concern form regarding allegedly retaliatory sanctions. Defendant Radzyminski "initiated a disciplinary report" for harassment. *Compl.* at 9. Radzyminski stated that he believed "the grievance was written … in a blatent [sic] attempt to harass and intimidate staff through words to get the sanction removed." *Id.* Plaintiff has not offered anything supporting a reasonable inference that Radzyminski did not subjectively believe that the concern form was intended to harass and intimidate staff. Because grievances intended to harass are not protected by the First Amendment, *see Debarr*, 648 F. App'x at 708, and because there is no plausible allegation that Radzyminski acted more than negligently, Plaintiff may not proceed on his right-to-petition or retaliation claim based on this incident.[5] Plaintiff's

---

[5] The Court notes that, if the disciplinary offense report was based solely on the language in the concern form and not on an independent investigation or staff observation, Radzyminski likely violated IDOC policy by issuing the DOR. *See* IDOC SOP 316.02.01.001 at 10. However, such a policy violation does not plausibly allege a constitutional violation. *See Walker v. Sumner*, 14 F.3d 1415, 1420 (9th Cir. 1994) (stating that, as long as minimum constitutional requirements are met, a prison need not comply with its "own, more generous procedures"), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995); *Lowrey v. Walton Cty. Sheriff's Dep't*, No. 3:07-CV-121CDL, 2008 WL 660332, at *3 (M.D. Ga. Mar. 5, 2008) (unpublished) ("It is not the function of this Court to review regulations established by prison authorities unless a constitutional violation is presented.").

claims against Defendants Lav, Brother, Klingensmith, and Dietz—who "approved," "physically served," "reviewed," and "upheld" the disciplinary report, respectively—are implausible for the same reason. *Compl*. at 10–11.

On January 9, 2018, Defendant Chappele took one of Plaintiff's concern forms; after reading it, she returned it because "the language [wa]s not appropriate." *Id*. at 12. She then threw the concern form, as well as a letter Plaintiff wanted to send, in the trash. *Id*. Plaintiff has not described the concern form at all, so he has not plausibly alleged that it was a nonfrivolous petition for redress. However, Plaintiff may proceed on his First Amendment interference-with-mail claim based on Chappele's decision to throw away the letter. Plaintiff alleges that Lieutenant Husk is the person who suggested that Chappele take this action and claims several staff members told him that Husk had authorized similar action. *Id*. at 12, 14. Husk later admitted this. *Id*. at 14. Therefore, Plaintiff may proceed on these mail interference claims against Chappele and Husk.

On January 8 and 10, 2018, Defendant Olsen threw a total of four of Plaintiff's concern forms in the trash because they contained disrespectful language. *Id*. at 12. Because Plaintiff does not provide any information as to what these concern forms were about, he has not plausibly alleged they were nonfrivolous. For that reason, Plaintiff may not proceed on these right-to-petition claims.

On January 9, 2018, Defendant Held "refused to process" a concern form, and issued a C-note regarding that concern form, because she believed it contained disrespectful language. *Id*. at 12–13. Plaintiff's right-to-petition claim based on this conduct is implausible because, once again, Plaintiff has not plausibly alleged the

concern form was nonfrivolous. Plaintiff's retaliation claim based on the C-note is also implausible, because Plaintiff has not plausibly alleged that (1) entering a C-note into the prison's electronic database constitutes an adverse action that would chill a person of ordinary firmness from engaging in protected activity, (2) entering a C-note about staff contact with an inmate is not reasonably related to a legitimate penological interest, or (3) Held entered the C-note with a retaliatory motive. *See Turner*, 482 U.S. at 89–93; *Mendocino Envt'l Ctr.*, 192 F.3d at 1300; *Pratt*, 65 F.3d at 806.

Between January 7 and 11, 2018, numerous Defendants refused to process various concern forms submitted by Plaintiff. These Defendants include officers Sanabaria (on orders from Defendant Tramel), White, Frahs, Janoushek, Contreras, and Baker. *Compl.* at 13–14. However, Plaintiff provides no allegations as to the content of the concern forms. Thus, he has not plausibly alleged that they were nonfrivolous, and he may not proceed on these right-to-petition claims.

Plaintiff states that, in January 2018, Lieutenant Husk told Plaintiff that, if Plaintiff continued using disrespectful language in his grievance forms, Husk would "retaliate further by taking privileges." *Id.* at 14. This threat to "take privileges" is simply too vague to chill a person of ordinary firmness from engaging in future First Amendment activity. *See Mendocino Envt'l Ctr.*, 192 F.3d at 1300. Thus, Plaintiff may not proceed on his retaliation claim based on this incident.

Finally, Plaintiff seeks injunctive relief. *Compl.* at 15. In addition to injunctive relief as to the above-described claims upon which Plaintiff will be allowed to proceed, he may also proceed on his injunctive relief claim, regarding SOP 316.02.01.001, against

the state official who has direct responsibility in the area in which Plaintiff seeks relief. *See Rounds v. Or. State Bd. of Higher Educ.*, 166 F.3d 1032, 1036 (9th Cir. 1999). That official appears to be Warden Christensen. Therefore, Plaintiff may proceed on his right-to-petition claim against Christensen, but only for injunctive relief.

**5.     Conclusion**

For the reasons set forth above, the Complaint plausibly states the following claims:

- Right-to-petition claims—for damages and injunctive relief—against Defendant McKay, with respect to (a) the January 10, 2018 concern form complaining about the C-note, (b) the April 11, 2018 concern form addressed to Morrison that contained the "Puke" comment, and (c) the October 2018 concern form regarding Plaintiff's post-conviction petition;

- Interference-with-mail claims—for damages and injunctive relief—against Defendants Chappele and Husk, based on Chappele's January 9, 2018 confiscation and destruction of Plaintiff's outgoing mail; and

- A right-to-petition claim—for injunctive relief only—against Warden Christensen, with respect to the enforcement of SOP 316.02.01.001.

This Order does not guarantee that these claims will be successful. Rather, it merely finds that they are plausible, meaning that the claims will not be summarily dismissed at this time but should proceed to the next stage of litigation. This Order is not intended to be a final or a comprehensive analysis of Plaintiff's claims. It is Plaintiff's burden to thoroughly set forth the legal and factual basis for each claim.

Defendants may still file a motion for dismissal or motion for summary judgment if the facts and law support such a motion, although motions to dismiss based on Rule 12(b)(6) are generally disfavored if filed after the issuance of a screening order under §§ 1915 and 1915A. Because (1) prisoner filings must be afforded a liberal construction, (2) prison officials often possess the evidence prisoners need to support their claims, and (3) many defenses are supported by incarceration records, an early motion for summary judgment—rather than a motion to dismiss—is often a more appropriate vehicle for asserting defenses such as non-exhaustion or entitlement to qualified immunity.

## ORDER

**IT IS ORDERED:**

1.      Plaintiff may proceed on the claims set forth above against Defendants McKay, Chappele, Husk, and Christensen. All other claims against all other Defendants are DISMISSED, and all other Defendants are TERMINATED as parties to this action.

2.      Defendants McKay, Chappele, Husk, and Christensen will be allowed to waive service of summons by executing, or having their counsel execute, the Waiver of Service of Summons as provided by Fed. R. Civ. P. 4(d) and returning it to the Court within 30 days. If Defendants choose to return the Waiver of Service of Summons, the answer or pre-answer motion will be due in accordance with Rule 12(a)(1)(A)(ii). Accordingly, the Clerk of Court will forward a copy of the Complaint (Dkt. 2), a copy of this Order, and a Waiver of Service of Summons to **Mark Kubinski, Deputy**

**Attorney General for the State of Idaho, Idaho Department of Corrections, 1299 North Orchard, Ste. 110, Boise, Idaho 83706**.

3. Should any entity determine that the individuals for whom counsel for the entity was served with a waiver are not, in fact, its employees or former employees, or that its attorney will not be appearing for the entity or for particular former employees, it should file a notice within the CM/ECF system, with a copy mailed to Plaintiff, identifying the individuals for whom service will not be waived.

4. If Plaintiff receives a notice indicating that service will not be waived, Plaintiff will have an additional 90 days from the date of such notice to file a notice of physical service addresses, or his claims may be dismissed without prejudice.

5. The parties must follow the deadlines and guidelines in the Standard Disclosure and Discovery Order for Pro Se Prisoner Civil Rights Cases, issued with this Order.

6. Any amended pleadings must be submitted, along with a motion to amend, within 150 days after entry of this Order.

7. Dispositive motions must be filed no later than 300 days after entry of this Order.

8. Each party must ensure that all documents filed with the Court are simultaneously served upon the opposing party (through counsel if the party has counsel) by first-class mail or via the CM/ECF system, pursuant

to Federal Rule of Civil Procedure 5. Each party must sign and attach a proper mailing certificate to each document filed with the court, showing the manner of service, date of service, address of service, and name of person upon whom service was made.

9. The Court will not consider ex parte requests unless a motion may be heard ex parte according to the rules and the motion is clearly identified as requesting an ex parte order, pursuant to Local Rule of Civil Practice before the United States District Court for the District of Idaho 7.2. ("Ex parte" means that a party has provided a document to the court, but that the party did not provide a copy of the document to the other party to the litigation.)

10. All Court filings requesting relief or requesting that the Court make a ruling or take an action of any kind must be in the form of a pleading or motion, with an appropriate caption designating the name of the pleading or motion, served on all parties to the litigation, pursuant to Federal Rule of Civil Procedure 7, 10 and 11, and Local Rules of Civil Practice before the United States District Court for the District of Idaho 5.1 and 7.1. The Court will not consider requests made in the form of letters.

11. No party may have more than three pending motions before the Court at one time, and no party may file a motion on a particular subject matter if that party has another motion on the same subject

matter currently pending before the Court. Motions submitted in violation of this Order may be stricken, summarily denied, or returned to the moving party unfiled.

12.     Plaintiff must notify the Court immediately if Plaintiff's address changes. Failure to do so may be cause for dismissal of this case without further notice.

13.     Pursuant to General Order 324, this action is hereby returned to the Clerk of Court for random civil case assignment to a presiding judge, on the proportionate basis previously determined by the District Judges, having given due consideration to the existing caseload.

DATED: March 6, 2020

B. Lynn Winmill
U.S. District Court Judge