```
                 UNITED STATES DISTRICT COURT

                      DISTRICT OF IDAHO

                      SOUTHERN DIVISION


KENT WILLIAMS,                 )   Case No. CV20-08-REB
                               )
     Plaintiff,                )
                               )         Boise, Idaho
     vs.                       )        October 5, 2020
                               )
DEPUTY WARDEN McKAY, et al,    )
                               )
     Defendants.               )
                               )
. . . . . . . . . . . . . . . )



               VOLUME I OF I
  TELEPHONIC HEARING ON TEMPORARY RESTRAINING ORDER
        BEFORE THE HONORABLE RONALD E. BUSH
            UNITED STATES MAGISTRATE JUDGE




APPEARANCES:

For the Defendants:         MR. BRADY JAMES HALL
(by telephone)              Moore, Delia, Kraft & Hall
                            P.O. Box 6756
                            Boise, Idaho   83707




COURT RECORDER:             TRANSCRIPTION BY:

LORETTA CASE                TAMARA A. WEBER, CSR
U.S. District Court         P.O. Box 387
                            Caldwell, Idaho   83606




Proceedings recorded by electronic recording.  Transcript
produced by transcription service.
```

I N D E X

| GOVERNMENT'S WITNESS: | PAGE | LINE |
|---|---|---|
| MADDOX, Bobby Ray | | |
| Direct Examination by Mr. Hall | 5 | 22 |
| Examination by the Court | 11 | 2 |
| Redirect Examination by Mr. Hall | 17 | 19 |

3

1       (Proceedings begin.)
2       COURT: All right. Ms. Case, if you'll call the
3   matter, please.
4       CLERK: Yes, Your Honor. The Court will hear at this
5   time the motion hearing in Civil Case No. 20-08, Kent Williams
6   versus Deputy Warden McKay. Mr. Williams I don't believe is
7   appearing and for defense counsel, if you could state your
8   appearance.
9       MR. HALL: Brady Hall, attorney for the defendants.
10      COURT: All right. Mr. Hall, is there anyone else
11  in -- at your end of things?
12      MR. HALL: Just my assistant in my office here. I have
13  a correctional lieutenant on standby, Bobby Maddox. He was the
14  one who was organizing the hearing and secured a conference room
15  and a speaker phone as the Court had ordered and advised the
16  Court on Saturday in a declaration that Mr. Williams was
17  refusing to be escorted in accordance with IDOC protocols and
18  directives. He will not wear a mask and he will not wear a
19  smock.
20      It was confirmed moments ago from Mr. Maddox that he
21  again spoke with Mr. Williams and he refuses to wear his smock
22  or mask. According to Mr. Maddox, Mr. Williams said that he may
23  reconsider if the judge orders him to do so. This is
24  frustrating --
25      COURT: Well, Mr. Hall -- Mr. Hall, I'm going to

4

1   interject. I do want you to get Lieutenant Maddox on the line
2   and I just -- I want a record made of this and so I'll ask you
3   to call him, please, and inquire of him as to the reasons why
4   Mr. Williams is not available. I just need to get a record so I
5   know exactly what I'm dealing with here, please.
6       MR. HALL: Absolutely, Your Honor. I just sent an
7   e-mail to Mr. Maddox to appear on the conference call.
8       COURT: All right. Well, while he's joining the call,
9   then we'll just -- so the record is clear from the outset,
10  we're on a telephone conference call for the purpose of the
11  Court hearing from the parties in regard to a motion for
12  temporary restraining order that was filed by Mr. Williams. The
13  Court entered an order setting up this hearing with instructions
14  to the Idaho Department of Correction to make a facility
15  available to Mr. Williams at the penitentiary for him to
16  participate.
17      Mr. Hall, Kenneth Shumard who's the staff attorney in
18  my chambers working with me on this case is also on the line.
19      MR. HALL: Your Honor, I think Lieutenant Maddox may
20  have just joined.
21      LIEUTENANT MADDOX: Yes, I did. Here I am, sir.
22      COURT: Okay. Mr. Hall, let's begin then if you'll, as
23  an officer of the court, vouch for the identity of Lieutenant
24  Maddox from his voice and from the arrangements that you've made
25  with him.

5

1       MR. HALL: I do, Your Honor.
2       COURT: Okay. Then Lieutenant Maddox, I had asked Mr.
3   Hall to call you as a witness in this hearing so we can inquire
4   of you as to the circumstances that exist today in regard to my
5   order that Mr. Williams be provided with a facility at the
6   penitentiary for him to participate in the hearing. And I've
7   received information about whether or not he's willing to do so
8   or why he might not be willing to do so but I want to make a
9   record of that. So, Ms. Case, if you'll swear in Lieutenant
10  Maddox, please.
11      CLERK: Yes, Your Honor. Lieutenant, if you could
12  raise your right hand, please.
13              (BOBBY RAY MADDOX is sworn.)
14      CLERK: Thank you. Just for our record, sir, if you
15  could spell -- excuse me, state your full name and spell your
16  last.
17      WITNESS: Okay. My name is Bobby, common spelling,
18  Ray, R-a-y, Maddox, M-a-d-d-o-x.
19      CLERK: Thank you.
20      COURT: All right. Mr. Hall, go ahead.
21      MR. HALL: Thank you, Your Honor.
22              DIRECT EXAMINATION
23  QUESTIONS BY MR. HALL:
24  Q.  Lieutenant Maddox, would you please state your position at
25  the Idaho Department of Corrections.

6

1   A.  Yes, sir. I am a correctional lieutenant for the Idaho
2   State Correctional Center.
3   Q.  And how long have you held that position?
4   A.  It has been about two years now.
5   Q.  And as part of your job duties, have you been recently
6   appointed to correspond and be the point of contact with Mr.
7   Williams?
8   A.  That is correct.
9   Q.  And what is your understanding as to Mr. Williams' current
10  housing?
11  A.  Presently, Mr. Williams is on suicide watch or -- he's on a
12  level of suicide watch that we call close observation.
13  Essentially he has been in that status for numerous weeks now.
14  He's expressed his verbal refusal to comply with any kind of
15  risk assessment or suicide assessment from our mental health and
16  clinical staff so they could assess him and deem appropriate a
17  more -- or a less restrictive housing environment. So due to
18  that, he has been on a prolonged suicide watch.
19  Q.  Is it your understanding that Mr. Williams has made threats
20  of self harm as well as self homicidal intentions to staff?
21  A.  Yes, sir. He pretty much daily submits concern forms
22  stating that by speaking to him, the clinicians invoke homicidal
23  and suicidal thoughts in him. He's also made a number of verbal
24  threats to staff including myself personally, statements such
25  as, "If I get an opportunity, I'm going to go after staff, take

7

1  as many of them out as I can in the process," things of that
2  nature, and then he keeps reiterating his suicidal thoughts.
3  Q. Now, Lieutenant Maddox, you're aware that the Court has
4  directed IDOC by way of an order to provide Mr. Williams a
5  conference room and access to a speaker phone at ISCC for
6  purposes of this hearing?
7  A. Yes, sir.
8  Q. And were those arrangements made by IDOC?
9  A. They were. We arranged for an office in our A Block housing
10 unit. It has carpet and it's a smaller area so there's less
11 echo. We spoke with Mr. Williams and expressed our intention to
12 bring him into this area where there's access to a speaker phone
13 so he can participate in this hearing.
14       He -- and yes, those arrangements were made. We did
15 speak to him regarding the manner of clothing that would be
16 required as he's still on suicide watch and the requirements to
17 wear a mask for -- for the prevention of the spread of the
18 Covid-19 virus.
19 Q. And has Mr. Williams refused to be escorted to the
20 conference room for this hearing?
21 A. Yes, he has. He --
22 Q. And has he refused to wear a mask that is required pursuant
23 to IDOC directives due to the Covid-19 pandemic?
24 A. That is correct. I asked him if he would comply with that
25 this morning and he indicated that he would not. And then

8

1  shortly before the scheduled hearing, about 1:35, I asked him
2  again on video if he would be willing to comply with wearing the
3  mask and his suicide smock so that we could escort him to the
4  appropriate area for his hearing. He indicated that he refused
5  to do both unless specifically ordered to by the judge.
6  Q. And did you also advise Mr. Williams on Friday of the
7  process that IDOC would follow to escort him from his cell in
8  suicide watch to the conference room?
9  A. Yes, I did.
10 Q. And did he indicate his intentions to refuse to wear a mask
11 and suicide smock at that time?
12 A. So there were two separate conversations I had with him on
13 Friday. In the first one, he overtly refused to do both. In
14 the second one, he was noncommittal about whether he would or
15 would not and said that he would make that decision the day of
16 the hearing.
17 Q. Now, why is it important that Mr. Williams wear a mask while
18 being escorted with security staff and during the hearing?
19 A. So basically, our -- our directive from our chief of prisons
20 is that all staff and inmates are required to wear masks while
21 on duty while in the facility. That's an expectation that we
22 require of all inmates during any escort, any kind of transport,
23 they have to wear a mask to and from and during it. The only
24 exceptions being like while they're sleeping in their bunk areas
25 or if they're eating or drinking.

9

1  So -- and the reason for that, our facility was kind of
2  the first outbreak in the South Boise Correctional Complex. I
3  think we totaled over a thousand inmates that ultimately tested
4  positive so we are still following those mandates to help
5  prevent any spread or any infection of Mr. Williams or anyone
6  else.
7  Q. Now, because of Mr. Williams' status on suicide watch and
8  recent ideations of suicide and homicide, is it even possible to
9  escort Mr. Williams where he will not have any contact with any
10 security staff?
11 A. There is not while he's on suicide watch. The cell that he
12 is in is specifically designed to prevent like being able to
13 fashion any kind of noose or hanging or anything like that. We
14 did propose to him attempting to do the hearing in the cell that
15 he was in but he refused to participate with that as well.
16 Q. And I want to ask you some questions about the anti-suicide
17 smock. Has Mr. Williams demanded clothing?
18 A. Uh-huh.
19 Q. Is that a yes?
20 A. Yes, he has.
21 Q. And are there security concerns with providing Mr. Williams
22 prison-issued clothing more than just the suicide smock for this
23 hearing?
24 A. I'm sorry. Can you repeat the question, sir?
25 Q. Are there any security concerns with providing Mr. Williams

10

1  standard issue prison clothing, a shirt, pants, for purposes of
2  this hearing?
3  A. Yes, sir. There's basically two main reasons. Anything --
4  if we were to provide him clothing and he were to engage in any
5  kind of self-injurious behavior or if he were to receive that
6  clothing and refuse to relinquish it. In his status on suicide
7  watch, he's not allowed to possess that kind of item so if he --
8  if we had to immediately intervene on an attempt of self-injury,
9  it would put staff -- staff and Mr. Williams at risk of possible
10 injury, especially given his repeated threats against staff
11 members.
12       The other one being if he simply refused to relinquish
13 it and was doing nothing with it at that time, with him being on
14 suicide watch, we would normally, given his refusal to
15 relinquish the items, initiate a planned use of force to
16 retrieve those items. We would of course utilize them in an
17 amount of force necessary but that's going to be determined by
18 his actions.
19 Q. Understood. And one final question. Lieutenant Maddox,
20 would it be reasonable and appropriate to transport Mr. Williams
21 naked to his hearing?
22 A. Absolutely not. It's always our requirement that if we are
23 escorting any offenders that they be properly dressed. To
24 escort an inmate through the facility in the nude I think would
25 be highly inappropriate.

**11**

1  MR. HALL: No further questions, Your Honor.
2              EXAMINATION
3  QUESTIONS BY THE COURT:
4  Q. All right. Lieutenant, describe for me this suicide smock.
5  A. Okay. It is a heavy -- it's a dark green heavy canvas -- I
6  don't know how to describe it other than like a smock or like a
7  tunic. It fastens with Velcro and it covers up the person's
8  bodies for their dignity. But it cannot, without some kind of
9  great force or a tool, be taken apart and utilized to make a
10 noose or anything else like that. So it's a very tough item of
11 clothing that's specifically designed for those who have been
12 deemed a potential suicide risk.
13 Q. Well, you can visualize it. I can't so I'm not sure. Are
14 the arms free when one's wearing a suicide smock?
15 A. Yes. It does not have -- it basically hangs off of the
16 shoulders. It doesn't have sleeves. It's kind of like a giant
17 heavy thick tank top but that fastens together in the front.
18 Q. All right. So it has no sleeves.
19 A. Correct.
20 Q. It has no holes like a tank top t-shirt where you could put
21 your arms through.
22 A. Uh-huh.
23 Q. Is that correct?
24 A. Basically, yes. So it has -- they have two areas that like
25 overlap over the shoulders and they fasten together and then

**12**

1  they come together in the center and kind of like a button-up
2  shirt. They fasten together with the Velcro in the center.
3  Q. And how far down the body does it extend?
4  A. To about the knees.
5  Q. All right. So when someone's wearing it, they're not able
6  to extend their arms or use their arms in any way? Is that
7  correct?
8  A. They can extend their arms. It doesn't actually like hang
9  off of their arms at all. So as long as they're not in like any
10 kind of restraints, they have full range of motion and ability.
11 It's really just designed to provide some coverage and dignity
12 without creating a risk to their suicide. It's not like a
13 restraint jacket or anything that's restrictive.
14 Q. Except that they can't -- I gather it's fastened in a way
15 that they can't get it over their head. Is that right?
16 A. Over their head?
17 Q. Yeah. In other words, they can't take it off themselves?
18 A. They can take it off. It's only held together with -- it's
19 only held together with the Velcro. It would give way like
20 under any kind of weight or anything like that.
21 Q. Okay. What clothing is Mr. Williams provided with in his
22 cell at this time?
23 A. As far as clothing, it's only that smock.
24 Q. All right. And so are you the person that has communicated
25 directly with Mr. Williams about these things?

**13**

1  A. Yes, sir.
2  Q. And is he leaving the cell for other purposes in the time
3  that he's been on suicide watch?
4  A. The only time that he has left that cell while on watch, he
5  has not taken -- or has not requested a shower to my knowledge.
6  I would have to look at our logs. If he would have, he would
7  have been in that smock. And I think he was pulled out at one
8  point a couple weeks ago just for like a cell search. He wore
9  that smock. It's the only piece of clothing that they are
10 typically allowed. They are also sometimes offered a pair of
11 paper underwear like disposable paper underwear as well that
12 goes with the smock.
13 Q. Otherwise he has no underclothing underneath his smock?
14 A. That is correct.
15 Q. Okay. So I'm still not clear. You don't know whether he
16 has left the cell at any time in the time that he's been on
17 suicide watch?
18 A. I know he was restrained and removed from the cell so that
19 staff can conduct a cell search. To my knowledge, he has not
20 accepted any offer to go and take a shower, for example. He's
21 been remaining in that cell and has not been coming out.
22 Q. So my understanding from the materials that have been
23 supplied or that have been filed in this matter are that he has
24 been on suicide watch in this cell since July 10 of 2020.
25 A. I would have to double-check. That sounds accurate to me.

**14**

1  Q. All right. But that's what the affidavits or declarations
2  and the briefing say. I forget exactly where it's located in
3  the materials I reviewed. So in that time period, he's not --
4  he's never been out of his cell except when he was removed for a
5  cell search?
6  A. That is my knowledge. Last we were looking at the logs, I
7  don't believe he has accepted a shower. He recently requested
8  like a haircut but I don't know that he has taken up any offer
9  for a shower.
10 Q. I assume then he has a toilet and running water in there?
11 A. Yes, he does.
12 Q. Okay. And is that -- how do you communicate with him? I
13 mean not -- I assume speaking the English language but how
14 physically is that accomplished?
15 A. Physically, it's done at his door. The door to his cell has
16 a large window where I can see like his entire cell, his entire
17 body, and then we have like some perforations that are built
18 into the door to allow unimpeded speech to and from. So every
19 time that I go and speak with him, it's through the cell door.
20 Audibly through those perforations in the door.
21 Q. Okay. And do you have a slot that meals are provided to him
22 through?
23 A. Yes, sir. We call it a utility port. It's secured with a
24 padlock and any time that he needs to receive food or any kind
25 of other item like toilet paper, it's through that port.

15

1 Q. All right. So he has filed two handwritten documents in
2 regard to this motion, the initial motion and then a further
3 document that was filed last week I think. What is your
4 understanding about how he was able to have paper and pen or
5 pencil to write those documents?
6 A. It's my understanding that he -- I know that --
7     MR. HALL: Your Honor, can I interject, please?
8     COURT: Sure you can.
9     MR. HALL: I'm not sure that this witness has the
10 foundation to testify as to everything that's occurred since Mr.
11 Williams has been on suicide watch. Lieutenant Maddox was
12 brought in fairly recently this past month to kind of coordinate
13 some more recent efforts. So he may not have personal knowledge
14 as to all of the filings that have been made by Mr. Williams or
15 how they were conducted. I think he can speak to some recent
16 time but I also don't know to what extent that's really relevant
17 to today's hearing which is not scheduled as an evidentiary
18 hearing.
19     COURT: Well, I understand that, Mr. Hall. I'm trying
20 to get my arms around the circumstances so I can make a decision
21 about what else to do, if anything. And as you might imagine,
22 from the Court's view of all of this, it's a little difficult to
23 do that when what I'm dealing with is an inmate who's making
24 representations in a written form but is not appearing and I
25 appreciate the reasons that IDOC says that that's the case and

16

1 it's his choice, not their choice.
2     But I'm trying to get some sense about the issues that
3 he's raised given the fact that as recently as the 3rd of
4 September, he's filed a handwritten document and the State is
5 telling me that he can't have any of those things, paper or pen,
6 on suicide watch.
7     So if Lieutenant Maddox has an understanding about
8 that, then I'd like to hear that even if he doesn't have
9 firsthand knowledge. If he doesn't, he can say so. And Mr.
10 Hall, if you would rather I simply not inquire of these things
11 in the context of a TRO, then we can set it for an evidentiary
12 hearing. I don't intend to -- certainly not trying to surprise
13 you with anything. I'm just trying to get to the bottom of
14 enough of this so I can decide what needs to be done.
15     So would you like me to set an evidentiary hearing?
16     MR. HALL: Your Honor, it --
17     COURT: You needn't feel like your response is going to
18 make me unhappy. Whichever way you think is appropriate for
19 your client, that's what you should do.
20     MR. HALL: Well, I appreciate that, Your Honor. I am
21 concerned about the record on this.
22     COURT: Okay.
23     MR. HALL: I'm trying to take this in stages and I
24 would -- I would expect the parties and the Court to do it as
25 well. Currently, Mr. Williams has a motion for TRO and I don't

17

1 think that he has submitted evidence in support of that. Now, I
2 recognize the Court's concerns that Mr. Williams is not being
3 provided with adequate process to make the record he needs so I
4 understand the paradox there.
5     I'm fine with some limited questioning of this witness
6 to the extent he has personal knowledge, but I don't think it
7 really changes the underlying concerns here and the
8 considerations that the Court needs to take in place.
9     COURT: All right. Mr. Hall, that's fine. We'll end
10 that portion of my inquiry of him and I'll make a decision about
11 whether to set it for an evidentiary hearing.
12     I am interested in hearing -- and if you want to follow
13 up on any of those questions I asked of him, then certainly you
14 should feel free to do so. And then after that, I have some
15 further questions for you. Did you wish to follow up on any of
16 the questions that I'd asked of Lieutenant Maddox?
17     MR. HALL: A couple, Your Honor.
18     COURT: Go ahead.
19         REDIRECT EXAMINATION
20 QUESTIONS BY MR. HALL:
21 Q. Lieutenant Maddox, does the anti-suicide smock in any way
22 impair -- or would it in any way impair Mr. Williams' ability to
23 walk or use his hands and arms during the hearing?
24 A. None whatsoever.
25 Q. And the same with the mask. Would having Mr. Williams wear

18

1 a mask to prevent the spread of Covid-19 in any way impair his
2 ability to be escorted to the hearing and sit at the conference
3 table and participate by phone?
4 A. No, sir. I don't foresee any possible reason why that would
5 prevent that. We all have to and we all do it successfully. We
6 use phones and radios and stuff while we wear our masks as well.
7 So I don't see that being a hindrance at all.
8 Q. Okay. And are you aware of currently the procedures that
9 are in place that will -- that attempt to strike a balance
10 between the security and health concerns with Mr. Williams'
11 status on suicide watch and at the same time, his right to
12 access the courts?
13 A. Yes, sir. I've spoken to Williams on a few occasions trying
14 to initially on this last Friday before the hearing just to try
15 to see where his thoughts were on that because I know he had
16 some history of refusing to wear a mask and such. So I spoke to
17 him about that to see where he was at so that we can try to get
18 ahead of any particular -- any potential roadblocks to getting
19 him to the hearing.
20     He indicated at that time of course that he wouldn't
21 wear a mask or wear the smock. The mask being of course for
22 health reasons and the smock for his dignity. I've spoken to
23 him about alternatives. First on Friday proposed potentially
24 doing it in the cell that he was in through the cell window. He
25 was not amenable to that idea at all due to the echo and the

### 19

1  sound.
2     We had proposed bringing like a speaker phone outside
3  of his cell. Again, today, I reiterated the potential to bring
4  a phone by the cell and as well as the potential for maybe doing
5  a Zoom call. Like position a laptop outside of his cell to
6  allow him to participate in the hearing without having to pull
7  him out and thus require him to wear a mask. That was
8  unacceptable to him because of the sound issues as well as being
9  in the suicide watch cell unrestrained with no staff immediately
10 available, we couldn't provide him with writing instruments and
11 things like that. And eye glasses was another thing that he had
12 demanded. All things that we normally do not afford to
13 offenders that are on suicide watch because of the potential
14 they use them for self-injury.
15 Q. I understand that IDOC would love to have this situation
16 resolved but in the meantime, short of Mr. Williams cooperating
17 with staff and receiving a mental health assessment that will
18 allow him to potentially receive access to additional property,
19 how is IDOC in the meantime providing or advising Mr. Williams
20 of legal mail he receives?
21 A. So in keeping with our policies, we deliver the mail to the
22 inmate and we open it in their presence. This remains unchanged
23 while he's on suicide watch. The officer will come to the
24 window. And again, it's a big window so there's no -- like
25 there's no obscureness of what they're doing. The officer opens

### 20

1  the legal mail in his presence, skims through just to make sure
2  there's no contraband or any potentially dangerous items in
3  there.
4     And then our procedure that we had initiated was that
5  we would hold the legal mail up to the window, give him an
6  opportunity to read it, change the pages as needed and then
7  store it in a crate that's kept nearby.
8     More recently, Mr. Williams has expressed an inability
9  to read without his glasses though we have witnessed him reading
10 without any noticeable strain items that are held up to his
11 window such as concern forms and things like that.
12 Q. And has IDOC provided Mr. Williams with the opportunity to
13 use a transcriptionist or a scribe to complete concern forms,
14 grievance forms and letters to the Court?
15 A. Yes. We have allowed -- like his grievances, his concern
16 forms are dictated to usually a security officer who fills it
17 out for him and then submits it on his behalf. As far as
18 letters to the Court, it is my understanding that the paralegal
19 has done so and submitted those. I don't know if any other
20 staff have done letters for him.
21    We have offered -- or I know it had been proposed to
22 him to have like an inmate volunteer that would actually assist
23 him with writing out such papers. But he refused to have
24 another inmate do that even on a voluntary basis and insisted
25 that a staff member do it. And I think he's made a number of

### 21

1  requests regarding that but I think his requests have been very
2  much labor intensive and require a lot more than what we can
3  typically offer with our staffing.
4  Q. And describe for the Court the security concerns that come
5  with providing paper to an inmate in security watch.
6  A. Yes. When it comes to being on -- on suicide watch, there's
7  not necessarily an immediate concern like they would use paper
8  to commit self-harm. But through my experience having worked
9  out here for eight years and having previously worked in acute
10 mental health, I've seen where paper has been used in the
11 furtherance of self-injurious behavior such as to cover the
12 windows so that staff can't see what's going on. To jam it into
13 the edges of the door to a point where they actually become
14 unable to be opened without the use of a tool to do so. All
15 things that could prohibit staff from intervening in an active
16 self-injury.
17 Q. And do you have those concerns that Mr. Williams may use
18 paper in that way?
19 A. I think based on my experience, yes, I do. Just kind of
20 given his demeanor, his repeated insistence of being suicidal
21 and homicidal and I would say some of the methodical methods
22 that he's used for various things, I do believe it's within his
23 capability and potentially his motivation to do so.
24 Q. Are you aware that Mr. Williams has an attorney appointed by
25 the State court in Idaho to help him in a post-conviction relief

### 22

1  proceeding?
2  A. I do not. I was not aware.
3  Q. Are you aware of any barriers that currently exist between
4  Mr. Williams' ability to correspond with his court-appointed
5  counsel in that case?
6  A. I would say the only hindrance would be just the fact that
7  he is on suicide watch and unable to participate in that
8  directly and having to do it through intermediaries.
9  Q. And are you aware of any attempts by Mr. Williams to reach
10 out to his counsel?
11 A. None that I have personal knowledge of.
12 Q. And are you aware of any need or attempts by Mr. Williams'
13 attorney to access Mr. Williams?
14 A. I'm not aware.
15 Q. If Mr. Williams or Mr. Williams' attorneys need to
16 correspond together, is Mr. Williams able to do that by mail or
17 even in person if it becomes necessary?
18 A. I would say yes. Certainly in person as long as, you know,
19 we maintain, you know, between the door -- the security between
20 the door. As far as writing, I know we've offered him the
21 inmate that could dictate letters for him and such. Like I said
22 earlier, he refused if it was regarding a legal matter. I
23 believe he can -- I don't know for sure but I believe he can
24 access the paralegal to assist him with that as well.
25 Q. Okay. And have you personally instructed Mr. Williams to

23

1 contact the ISCC paralegal if he has any requests regarding the
2 need for assistance to file legal pleadings?
3 A.  Yes, I have.
4 Q.  And has Mr. Williams taken the paralegal up on any of those
5 offers or requested any assistance to your knowledge?
6 A.  To my knowledge, I believe in the time that I've been his
7 assigned point of contact, I have seen him submit either one or
8 two access to court request forms directly to the paralegal.  I
9 do know from her logs that she has assisted him with mailings
10 and things of that nature and e-filings at his request.
11 Q.  And now what are the security concerns with providing an
12 inmate in suicide watch with a pen or other writing utensil?
13 A.  He would be -- the potential for it to be used in a self-
14 injurious manner.  Typically speaking like any kind of hard
15 plastic.  Even like food containers.  They'll do alternative
16 food containers, for example, if they're concerned about them
17 being used for self injury.
18 Q.  And you mention that Mr. Williams' cell was searched
19 recently.
20 A.  Uh-huh.  Yes, sir.
21 Q.  And when was that if you recall?
22 A.  Oh, I believe -- I would say it was a week, week and a half
23 ago.
24 Q.  And were -- was there any contraband or any pens or writing
25 instruments found during that search to your knowledge?

24

1 A.  There was one small safety pen, like a little flex pen, that
2 was located in there.  Not one that we'd be concerned about
3 self-injury for.
4 Q.  Okay.  And --
5      COURT:  Just a moment.  Did you say pin, p-i-n, or pen,
6 p-e-n?
7      WITNESS:  P-e-n, sir.
8      COURT:  Okay.
9 BY MR. HALL:
10 Q.  Lieutenant Maddox, would you describe this safety pen?
11 A.  Yes.  It's about -- I'd say it's about three inches long of
12 soft highly bendable plastic.  It would be very difficult to use
13 in any kind of self-injurious manner because it would flex so
14 much.  And it's basically just kind of like a silicon or rubber
15 tube with the insert of a pen inside of it and just a little
16 ball point pen head.
17 Q.  And what's your understanding as to how Mr. Williams came
18 into possession of that pen?
19 A.  It's my understanding that he had been released from suicide
20 watch -- it would have been quite a while ago.  Either like a
21 month or two ago and he received it upon his release.
22 Apparently, he was -- apparently, he was then put back on watch
23 and was able to retain the pen on his person.
24      And it's my understanding the clinical staff weighed in
25 and determined that -- and this is also after my understanding

25

1 he had received some court ordered paperwork.  So the order came
2 down that he would not receive any further items aside from what
3 he had in his possession due to the concerns for his self-
4 injurious behavior.
5 Q.  And does Mr. Williams still have access to the safety pen?
6 A.  Yes, sir.
7      MR. HALL:  No further questions at this time, Your
8 Honor.
9      COURT:  I'm confused about those last answers,
10 Lieutenant.  You said he was ordered not to have what you refer
11 to as the safety pen after it was discovered but then you just
12 said that he still has it.
13      WITNESS:  That is correct, sir.  It was the direction I
14 received from my administration that we would not take the pen
15 from him.
16      COURT:  And when was that?
17      WITNESS:  That would have been -- it was the day that
18 we conducted the search so I don't have the exact date in front
19 of me but approximately a week to a week and a half ago.
20      COURT:  All right.  I'm not going to ask anymore
21 questions because I think we've already done more of an
22 evidentiary record than I probably set out to do.  So thank you,
23 Lieutenant.
24      All right.  Mr. Hall, then let me ask you, what has my
25 attention -- and I think one of the things I'm going to do is

26

1 we'll get a transcript made of this hearing and then I'll send a
2 hard copy of it to ISCC.  There's so many acronyms out there, I
3 sometimes get them mixed up but to the facility where Mr.
4 Williams is housed and have -- have you follow whatever
5 procedures you're currently doing so that he can read what took
6 place.
7      But here's -- let me describe to you so you have an
8 opportunity to respond to it.  One of the things that your
9 briefing focuses upon is that you say, well, he's been able to
10 file all these things and you make a list of the four or five
11 things that he's filed in this case.  Then elsewhere, your
12 briefing and the declarations you've submitted describe that
13 he's been in suicide solitary -- suicide watch solitary custody
14 since July 10 of this year which is nearly three months now
15 which is to include not having any paper or anything to write
16 with.
17      Now I'm hearing Lieutenant Maddox say that he had
18 what's known as a safety pen which Lieutenant Maddox also said
19 is something that there's not the same concerns about in terms
20 of being able to use it for self-injurious behavior and that he
21 was allowed to keep it.
22      And Mr. Williams says in what he has filed that he has
23 these other State cases -- post-conviction relief cases.  I
24 don't know whether he's got a habeas case or equivalent
25 proceeding in State court going on and he's concerned about

27

1  deadlines that may affect his ability to continue to keep those
2  cases going.
3         And what I have in front of me is a scenario that
4  notwithstanding the Turner decision appears to be a setting
5  where an inmate, because of his mental health status, has no
6  ability to prepare things on his own to file in these other
7  proceedings to be able to protect the interest that he may have
8  there with no prospect of that changing because the prison says
9  that -- because IDOC says none of this is going to change until
10 he meets these safety plan requirements that the Department of
11 Policy insists upon.
12        And that strikes me as a classic catch-22 and,
13 moreover, a catch-22 that is bound up in his mental health
14 circumstances as to which may prevent him from being -- from
15 complying with what IDOC says he has to comply with in order to
16 get any of the things that he needs to take action in either
17 this case or the other cases.
18        So what response would you have to the Court about
19 those concerns?
20        MR. HALL:  I think that's an interpretation that Mr.
21 Williams has advanced in reading between the lines as reasonable
22 and poses concern and that's the primary reason why I believe
23 IDOC has attempted to come up with alternatives.
24        At the same time, that interpretation is not supported
25 by the record.  I think there's evidence to suggest that Mr.

28

1  Williams is not being -- is misrepresenting certain facts to the
2  Court.  The reality is IDOC is providing him the ability to
3  monitor and be advised of legal pleadings that are filed not
4  only in this case but also in the underlying case and State
5  court which is his post-conviction relief.
6         Mr. Williams has an attorney who is -- who is acting on
7  his behalf.  I've personally spoken to that attorney and I can
8  attempt to elicit some additional testimony that may be helpful
9  to the Court from this attorney recognizing that Mr. Williams
10 has an ongoing bar action against this attorney.
11        But the reality is to the extent if there are any
12 actual deadlines that require Mr. Williams to meet, then he
13 needs to advise IDOC of the need to do so.  And I don't think
14 there's any ability with him receiving pleadings from the Court,
15 if a decision is entered, if a judgment is entered that requires
16 a timely appeal, that is certainly premature and there's no
17 evidence on the record that anything is even pending at this
18 time.
19        This is I hope the Court understands a very complicated
20 situation for my client.  They look at suicide watch as a very
21 acute status where people are on it for usually only a day or a
22 couple days and these types of issues with access to courts and
23 property are often avoided.  But if you have an inmate that is
24 uncooperative or unable to address any mental health concerns
25 or, on the other hand, Your Honor, maybe trying to manipulate

29

1  the process to have all of his property and legal material in
2  his cell on suicide watch which is inappropriate for the reasons
3  addressed in the declarations, then it creates a very complex
4  situation for IDOC.
5         The plan at this time is for IDOC to continue to
6  monitor this situation, ensure that Mr. Williams is advised of
7  his legal mail and given an opportunity to correspond with his
8  counsel and notify IDOC of any special needs or accommodations
9  that he needs in order to meet any legal deadlines.
10        Apart from that, Mr. Williams' requests have been to
11 force IDOC to provide him with all his legal mail which is
12 several thousand pages of documents I understand which he hasn't
13 articulated a need or any sort of reasonableness in his request.
14        COURT:  Has IDOC attempted to segregate the mail by
15 case or are they looking at it as a single corpus so to speak of
16 everything?  Because I know that he has had multiple cases in
17 our court and I assume probably in the State court but a number
18 of those cases are finished.  And so if the legal mail includes
19 things from those cases, then the necessity for that would be
20 certainly far less than anything that -- in a case that's open
21 and active.
22        MR. HALL:  Certainly, Your Honor.  I'm not aware nor
23 does the evidence reflect that IDOC is separating out legal mail
24 based on the type or venue of an action.  I think it's all being
25 treated 100 percent consistently.

30

1         COURT:  Yeah.  I guess what I'm saying is it all just
2  being stored in the same box?
3         MR. HALL:  I'm not sure about that.  I think that he's
4  being advised of it and that it is being held in his legal mail
5  file.
6         COURT:  Okay.  All right.  Okay.  I mean -- and
7  obviously, Mr. Hall, you're aware of the incongruity of the --
8  and I understand IDOC's -- the inherent difficulties in dealing
9  with mental illness in a correctional facility and the need for
10 the prison facilities to respond to acute crises of mental
11 illness.
12        Here though, the obvious question is when does acute
13 become something that's not acute anymore and whether there's
14 some remodeling of the policy needs to be analyzed and sorted
15 out and I don't -- I'm not suggesting that I have an answer here
16 today but I am -- there are concerns here that I'm trying to
17 sort out.
18        And it would obviously be made much easier if -- it
19 would be better, I should say, if Mr. Williams had made himself
20 available today.  I will say on the record that I don't intend
21 to order that he comply with anything relating to what the
22 prison has said is expected of him in terms of any attire to
23 come to a hearing of this sort.
24        All right.  Anything else that you'd want to make me
25 aware of or bring to my attention today in regard to what we've

31

1 discussed and what I may have -- may be doing in response to
2 what I have in front of me?
3     MR. HALL: Your Honor, I would like to refer the Court
4 to the declarations and I'm sure the Court has an opportunity to
5 review those before making a decision. There are two
6 declarations of Walter Campbell, chief psychologist of IDOC,
7 talking about Mr. Williams. There's also declarations of
8 Lieutenant Maddox as well as the Deputy Warden Dietz which set
9 forth the efforts that have been made to provide Mr. Williams
10 with access to courts while on suicide watch.
11     The issue before the Court now is on a motion for TRO,
12 a hearing this Court scheduled which Mr. Williams did not
13 appear. The issue is limited and IDOC is concerned about Mr.
14 Williams' behavior, his actions, very deliberate not to speak
15 with mental health staff which is necessary to help him as well
16 as comply with IDOC policies, but there's no evidence in the
17 record at this point to allow for this Court to determine that
18 Mr. Williams has met his very difficult burden of showing that
19 he is entitled to a mandatory preliminary injunction or TRO.
20     He has not shown how he will succeed on the merits but
21 also that he has failed to show that any, quote, extreme or very
22 serious damage will result if there was a pending deadline that
23 IDOC was not willing to provide him access to the courts that he
24 could meet that, then that would be a potentially different
25 scenario but we don't have that here and there's no evidence to

32

1 support that.
2     The balance of equities weigh heavily in IDOC's favor
3 here and the public in that the public, the prisons, the courts
4 all strive for a system that does not force the courts to
5 intervene and tell the prisons how to conduct their affairs,
6 especially on issues of mental health. Access to courts is a
7 constitutional right, no doubt, but it is limited under the
8 Turner test and here, IDOC has shown a legitimate penological
9 interest in their efforts not to provide Mr. Williams unfettered
10 access to all of his legal property yet at the same time
11 maintaining his access to courts in some meaningful way.
12     No further issues, Your Honor. Thank you.
13     COURT: All right. Thank you, Mr. Hall. And I'm aware
14 obviously that this was done on shorter notice than might
15 otherwise be the case but of course that's not unusual in a
16 motion seeking extraordinary relief in setting out some
17 colorable reasons about why that may be necessary.
18     All right. We'll try to get our hands around this as
19 quickly as we can at this end and then issue an order or
20 decision appropriate to whatever course I think I need to take
21 from here on out. I appreciate your argument and we'll be in
22 recess. Thank you.
23     MR. HALL: Thank you, Your Honor.
24         (Proceedings concluded.)
25

I, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


\_\_/s/ Tamara A. Weber_____          \_10/13/20\_\_\_\_\_

Signature of Approved Transcriber             Date


\_\_Tamara A. Weber_____

Typed or Printed Name