Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
T: (208) 724-2617
F: (208) 906-8663
chd@fergusondurham.com

Counsel for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| KENT WILLIAMS,<br><br>        Plaintiff,<br><br>v.<br><br>ASSOCIATE WARDEN McKAY et al.,<br><br>        Defendants. | Case No. 1:20-cv-00008-REB<br><br>**DECLARATION OF CRAIG H. DURHAM AND PROFFER IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** |

I, Craig H. Durham, declare under penalty of perjury that the following is true and correct:

1. This Court appointed me as pro bono counsel for Kent Williams to assist him in litigating an access to courts issue.

2. Due to the severe restrictions IDOC defendants have put on Mr. Williams's contact with the outside world, and because of the urgency of this matter, I

1

am not able to provide a signed declaration from Mr. Williams. Instead, I proffer here what I believe the evidence would show, based on my conversations with Mr. Williams and my independent investigation.

## Summary of Mr. Williams's Present Status

3. I have been unable to communicate by phone with Mr. Williams for the last two weeks, so I visited him at his cell at the Idaho Maximum Security Institution on March 5, 2021. I was able to speak with him and view the conditions under which he is being held. His health appears to be deteriorating.

4. IDOC transferred Williams to IMSI on or about February 22. Since then, he has been held on the "medical unit" in a solitary confinement cell, described in greater in this declaration.

5. At my visit, IDOC staff informed me that Williams would be held on the medical unit for 14 days based on Covid-19 protocol and then might be transferred to J Block. J Block is a restrictive housing unit at IMSI where inmates are held in their cells about 23 hours a day with limited privileges.

6. IDOC staff also informed me that once Williams was in J Block, the legal assistant might be able to facilitate his access to his legal materials. This transfer to J Block was tentatively scheduled March 9 or after.

7. I say that this transfer "might" occur because it was unclear to me whether Williams would need to meet certain behavioral benchmarks before he would be

moved to J Block, and, even if he were moved, whether he had to satisfy additional conditions before he could get access to a pen, indigent paper, and his legal materials. Given IDOC's defense in this case is that Williams has been on some type of long-term suicide watch with essentially no personal property because of IDOC policy, it is unclear to me whether, or why, that would now change. As of the filing of this declaration, to counsel's knowledge Williams is still in the medical unit at IMSI.

8. The most pressing concern, however, is that Williams claimed that he has not eaten for several days because of the condition in which his food had been given to him and the conditions under which he is required to eat it, also described in this declaration. Though he could engage in a rational conversation, he appeared exhausted, unsteady, and weakened.

9. With that backdrop, I recite the history of Williams's housing conditions, mental health treatment, and access to courts from July 2020 until now.

## Housing Conditions for the Last Eight Months

10. In July of 2020, IDOC staff placed Williams under a "suicide watch," claiming that he had threatened to harm staff and himself. IDOC assigned him to a cell in Unit A at the Idaho State Correctional Center. Unit A is an administrative segregation unit, not a mental health unit. The mental health unit is at the Idaho Maximum Security Institution. The mental health unit has more staff and more resources to treat people.

Unit A at ISCC is not staffed or designed to treat those with chronic or acute mental health problems.

*Conditions on Unit A at ISCC*

11. From July of 2020 until February 22, 2021, Williams was kept in what amounts to solitary confinement on Unit A at ISCC. He was housed by himself in a cinderblock cell with about 80 square feet almost 24 hours a day, every day.

12. The conditions were sparse, at best. Williams had a stainless-steel toilet and sink in his cell, and a small steel shelf and a bolted-down chair. Because he was on "suicide watch," he was not given standard-issue bed sheets. Instead, he had a stiff safety blanket. He had no jail clothing, only a "safety smock," which is basically a dress that is also made out of stiff material. He did not wear the smock. He sat in his cell naked.

13. IDOC provided Williams almost no personal property. He did not have a television or a radio. He had no books, magazines, puzzles, or other materials to occupy my mind. He did not have any telephone privileges to call friends and family. He was not given access to tablet or a kiosk to send Jpay email messages.

14. Staff has also not offered outdoor or indoor recreation. He has not even been given time in a dayroom. His out-of-cell time during the last eight months has been limited to, at most, showers a few days a week.

15. The lights were on in his cell all day and all night. In a typical cell, in contrast, the lights are on during the day but only a small "cell count" light is on at night, like a night-light. Twenty-four hours of constant fluorescent light made it difficult for Williams to sleep. It made his mental state worse.

16. Mealtimes under these conditions become critically important to the inmate. All meals were given to Williams with paper utensils, which are nearly useless. He has had to use his fingers to eat his food. The quality of the meals got considerably worse.

17. Due to the worsening conditions, including poor quality meals, Williams began to act out in February of 2021, which included spreading his own waste in his cell and on the bean slot. According to Williams, after that IDOC punished him by putting him on a "meal modification" diet of Nutraloaf. Nutraloaf is poor tasting mush that never changes. He began to lose weight.

18. IDOC has arbitrarily and inconsistently applied its policies to Williams over the last several months. Staff have acted in ways that are inconsistent with their stated reason that they are trying to protect Williams from harming himself or others.

19. For instance, staff have at times given Williams paper for him to keep in his cell, only to have a clinician or another staff member later order that it be taken away as a security risk. He has also had "flex" pens in his cell, but then they have later been confiscated as a security risk. Flex pens are designed specifically so that they

cannot inflict serious harm on anyone. They are small, about three or four inches, and made out of flexible plastic material.

20. As yet another example, Williams was given the same small plastic toothbrush that everyone on Unit A gets. This basic personal hygiene item is a few inches long. Williams had no history of using it as a weapon. But another staff member with a different opinion later saw that Williams had it, took it away, and gave him what amounts to a rubber thimble for brushing his teeth.

21. Clothing has also been a source of control. Inmates on suicide watch are not given standard jail-issue clothing to keep in their cells due to the risk that they may hang themselves. They instead have a stiff safety smock to wear. But IDOC has enforced this policy on Williams even when transporting him under the watchful eye of correctional officers. He refuses to wear the smock during transport, particularly when on the tier in view of other inmates. In October, staff ordered Williams to wear it to be transferred to an office for the telephonic hearing with this Court. Primarily for that reason, he declined to appear at the hearing.

22. Yet, despite the alleged risk of giving Williams something simple and dignified to wear during transport about the prison, IDOC nonetheless gave him a cell phone in his cell during phone calls with counsel and during a five-hour mediation with Judge Dale, all with no incident. After the mediation, however, staff informed

counsel that giving Williams the phone for additional calls was a risk and would not happen until his behavior improved.

*Present Conditions at IMSI*

23. IDOC transferred Williams to IMSI after the unsuccessful settlement conference.

24. As of the writing of this declaration, to counsel's knowledge Williams is housed in the medical unit at IMSI in a holding cell.

25. The conditions in the medical unit cell at IMSI are worse than those on Unit A at ISCC.

26. The cell is small, approximately 80 to 90 square feet. It has cinder block walls, no window, and constant fluorescent lighting. The cell door is made entirely of steel and has a small window at about eye level. Because the inmate population on this unit has medical or mental health problems, the unit is loud and disorienting.

27. Williams's cell is not equipped for him to flush his own toilet, which is controlled by a button outside of his cell door. Fecal matter and urine may sit a few feet away in the toilet for a period until Williams is able to get a guard's attention to flush the toilet. The toilet can remain unflushed or backed up even during meals, which are given in cell.

28. Williams reports that the cell also does not have hot water, and he has not been given soap or other cleaning products to clean himself after going to the bathroom or before he is given meals.

29. Once he arrived at IMSI, correctional officers gave him meals again with only paper utensils. They also cut up the food, and the quantity was smaller.

30. Essentially, Williams is required to eat with his fingers in what amounts to his own bathroom with human waste potentially languishing in a toilet a few feet away and with no ability to clean himself before eating.

31. As IDOC has informed the Court (Dkt. 83), Williams has continued to act out. He started urinating and defecating on the floor. Apparently, he has been extracted from his cell forcefully on a few occasions. Williams told counsel that he is behaving this way because he is being treated "like an animal."

32. When counsel met with Williams in person on March 5, he claimed to have not eaten for several days and would not eat under the current conditions. He appeared weakened and unsteady.

33. IDOC staff have indicated to counsel that Williams is scheduled to move to J Block in the near future, though, as noted above, that move is uncertain. It is also uncertain what privileges Williams may have in J Block and whether he will still be held under the restrictive suicide watch conditions described in this declaration.

## Lack of Mental Health and Medical Treatment

34. To counsel's knowledge, the primary source of on-the-ground mental health treatment in the IDOC system is through counseling sessions with mental health clinicians, who develop treatment plans. IDOC has a chief psychologist on staff, Dr. Campbell, and has contracted with Corizon, who employs a psychiatrist.

35. Williams does not trust the clinicians and does not believe that they have his well-being at heart. The same goes for Dr. Campbell, who Williams believes to be covering for IDOC rather than helping him.

36. Staff have told Williams that until he cooperates with the clinicians for a mental health assessment – so that they can allegedly determine whether he remains suicidal – they will continue to recommend that he stay under restrictive suicide watch conditions. This includes restrictions on his personal property, including his legal property.

37. Williams has explained to IDOC that to extent he may want to harm himself, it is *because* he cannot access the courts to raise his conditions of confinement claims and *because* of the conditions under which he has been required to live these last several months.

38. According to Williams, when a clinician comes to his cell, he or she stands outside and talks to him through the cell door. It is not confidential. He is usually uncooperative. The clinician simply asks a few questions and leaves.

39. Williams has not been offered any other form of mental health treatment aside from these short visits, and brief visits with Dr. Campbell, which he doesn't consider treatment at all. He has not been seen by an outside provider.

40. Williams is distrustful of mental health staff. He does not believe that they really care about him. He believes that they are instead using this situation as a reason to punish him. He has no patient/professional relationship with them.

41. To counsel's knowledge, IDOC has not attempted to develop any alternative treatment plan for this uncooperative yet allegedly suicidal patient. To the contrary, according to Williams, the conditions that IDOC has put him in, and that the clinicians approve, has made his mental state worse.

## Access to the Courts

42. While under these restrictions, without the assistance of pro bono counsel, Williams has not had the ability to meaningfully access this Court to litigate the conditions of his confinement. He is denied even the most basic tools. He is given no paper on which to write and has had unreliable access to a writing instrument. To the extent that he has been able to file a few things with the Court, it has only been because he has had contraband paper or a "flex pen." At times, he has had the help of unknowing or sympathetic staff.

43. IDOC has refused to allow him to keep any of his legal files or paperwork in his cell, either stored there permanently or checked out temporarily. To this point,

10

staff also won't let him even read legal filings, cases, or other legal resources in his cell. Instead, they stand outside his cell door and read to him whatever has been filed or sent to him.

44. IDOC claims that they have offered to help him with court access, but Williams asserts that is untrue. The only thing that he is aware of is that IDOC has offered to have an IDOC employee transcribe what he dictates to them. That would not be confidential.

45. Since last summer, IDOC's position has been all or nothing. It has not offered Williams any reasonable alternatives to these prohibitive restrictions so he can access the courts with a corresponding minimized risk to safety or security. For instance, IDOC hasn't allowed him to check out his legal files temporarily, and then return them. IDOC won't let him sit in a dayroom, or an office, or in the education building, or the chapel, and work on his legal cases while he is under supervision. He could even be restrained at the ankle.

46. IDOC has never offered the resource of an "inmate companion." Inmate companions are hired to act as trustees and watch potentially suicidal inmates. An inmate companion could supervise Williams while he does his legal work.

47. IDOC has certainly never offered to pay for a lawyer or an independent paralegal to give Williams a way to exercise his constitutional right ot access this Court.

The paralegals at the institutions are limited to providing packets and fill-in-the-blank documents. They are prohibited from giving legal advice.

EXECUTED ON THIS 9th day of March, 2021.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Craig H. Durham*
Attorney for Plaintiff
