UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

KENT WILLIAMS,

                    Plaintiff,

v.

DEPUTY WARDEN McKAY, et al.,

                    Defendants.

Case No. 1:20-cv-00008-REP

**MEMORANDUM DECISION AND ORDER**

Plaintiff Kent Williams is proceeding on his First Amended Complaint against Idaho Department of Correction (IDOC) Defendants. Dkt. 19. Pending before the Court is the IDOC Defendants' Motion for Summary Judgment, which is now fully briefed. Dkts. 159, 163, 167, 190. All named parties have consented to the jurisdiction of a United States Magistrate Judge to enter final orders in this case. Dkt. 22, 145. *See* 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. Dkt. 22. Having reviewed the record and considered the arguments of the parties, the Court enters the following Order.

**PLAINTIFF'S ACCESS TO COURTS ISSUES
AND REQUESTS FOR EXTENSIONS OF TIME**

Plaintiff filed a response to the Motion for Summary Judgment on May 5, 2022. Dkt. 161. Many months later he complained that he needed an extension of time to reply in support of his Motion for Oral Argument and an Evidentiary Hearing. Dkt. 185. The

Court has concluded that oral argument and an evidentiary hearing are not required, and, thus, no extension of time will be granted.

Plaintiff continues to complain that prison officials constructively deny him copy services, because they will not agree to return his documents via hand-delivery, rather than institutional mail. Because that is prison policy and Plaintiff's only option, and because he is a prisoner and a pauper, he opts out of copying. He has raised this issue in a separate access-to-courts case, 1:22-CV-00052-DCN, *Williams v. Paralegal Lifang, et al.* ("Case 52"). Chief United States District Judge David C. Nye has twice determined that Plaintiff failed to state a claim upon which relief can be granted, permitted amendment, and ordered Plaintiff to use the prison copy and access-to-courts services as provided by the prison, rather than as he would like them to be. Dkt. 25 in Case 52.

Judge Nye also denied a preliminary injunction motion on the same topic in Case 52. Plaintiff filed an interlocutory appeal of that denial. The United States Court of Appeal for the Ninth Circuit held that Plaintiff failed to demonstrate that such relief is warranted and denied Plaintiff's motion to establish protocols for e-filing. Dkts. 25, 43 in Case 52.

Plaintiff also raised his "constructive denial of copying" claims in Case No. 1:22-cv-00346-BLW, *Williams v. Atencio, et al.* ("Case 346"). In a recent order denying temporary or preliminary injunctive relief, Judge Winmill noted that Judge Nye had required the prison paralegal to file a twice-monthly report showing that Plaintiff is receiving access to the Courts in Case No. 1:16-cv-143-DCN, *Williams v. Fox* ("Case 143"). Judge Winmill reviewed those reports and determined that, contrary to Plaintiff's

**MEMORANDUM DECISION AND ORDER - 2**

assertions, he was receiving adequate access. Those reports consist of the following in

Case 143: Dkt. 328, filed 12/28/2022; Dkt. 326, filed 12/14/2022; Dkt. 319, filed

11/30/2022; Dkt. 302, filed 11/16/2022; Dkt. 291, filed 11/02/22; Dkt. 279, filed

1019/22; Dkt. 269, filed 10/05/2022; Dkt. 266, filed 09/07/2022; Dkt. 261, filed

08/24/2022; Dkt. 258, filed 08/10/2022; Dkt. 256, filed 07/27/2022; Dkt 254, filed

06/28/2022; and Dkt. 253, filed 06/15/2022. This time frame spans the time period of

Plaintiff's complaints in this case, which provides this Court with additional assurance

that Plaintiff is receiving adequate opportunities to use the prison copy and access to

courts services, if he desires.

Earlier in this case, the Court determined that it would provide Plaintiff with an

extension of time to respond to the summary judgment motion if he made the following

showing as a result of issue allegedly caused by the copy problems of his own making:

> Plaintiff shall file a notice that specifically states: (1) which
> date he attempted to use filing or copy services; (2) whether
> he refused to use the existing filing or copy services or
> Defendants refused to e-file or copy his documents; (3) which
> documents he attempted to have copied or filed; (4) whether
> the documents were ever copied or filed and when; (5) the
> title and content of the documents that were not copied or
> filed (and he should clarify whether he is complaining about
> his own set of copies and his own set of returned originals
> rather than an inability to e-file documents according to the
> established IDOC procedures; copies to be sent to parties are
> rarely needed because the e-file system emails those to the
> other party automatically); (6) a description of why the copies
> or documents support his position in opposing the pending
> summary judgment motion, with enough factual details that it
> can be a substitute for the copies or documents; (7) the harm
> that occurred or will occur to him as a result of the lack of
> copies or e-filing; and (8) a statement of (a) why he has
> incurred any harm given that the Court is permitting him to

**MEMORANDUM DECISION AND ORDER - 3**

> file a description of why the copies or documents support his
> position in opposing the pending summary judgment motion,
> with enough factual details that it can be a substitute for the
> copy or document, and (b) why he needs additional time to
> respond (and what length of time is needed) to the pending
> motion for summary judgment given that he is being
> permitted to file a description of the copy or document
> instead.

Dkt. 187, p. 3.

Instead of following the Court's Order requiring him to show a causal link between the copying issues and his response to the summary judgment motion, Plaintiff filed two notices stating why he still can do nothing, including properly filing a response to the Order, because he does not have the copies. Dkts. 188, 189. However, Plaintiff drafts his own court documents and frequently requests copies of the docket from the Clerk of Court, and so it is not impossible for him to recreate a list of what arguments or subject matter he believes is missing from each document he refused to have copied. *See* Dkt 180, dated 7/26/22; Dkt. 163, dated 5/12/22; Dkt. 141, dated 10/12/21 (dates the Clerk has provided the docket sheet to Plaintiff). Plaintiff has not shown that he could not comply with the Court's Order in a reasonable manner. Therefore, his request for an extension of time to provide further argument in opposition to summary judgment will be denied.

In addition, because this issue has been adequately reviewed by this Court, Chief Judge Nye, Judge Winmill, and the Ninth Circuit, the Court will not entertain any further argument about Plaintiff's inability to obtain copies, which in reality, is based on his refusal to use the copying services that are available to him because he believes his

**MEMORANDUM DECISION AND ORDER - 4**

original documents will be lost if he turns them over to prison staff for copying and return via institutional mail. *See* Plaintiff's Motion to Stay, Dkt. 185 in this case; Order at Dkt. 52 in Case 52. That is a battle Plaintiff can fight in Case 52, but it has little if nothing to do with his ability to make responsive arguments to Defendant's motions, and what little it does have to do with that ability (that he cannot refer to documents of his own that he previously filed and refused to have copied to make his new arguments), is due to his own choices. Nothing prevents him from making handwritten copies or outlines of his own filings for his own purposes if he does not trust the regular prison copy services.

## INTRODUCTION TO ADMINISTRATIVE EXHAUSTION ISSUE

Believing that the IDOC had a questionable policy prohibiting inmates from using disrespectful language in concerns and grievances to complain of incarceration conditions, Plaintiff decided he wanted to test his theory and file a lawsuit based upon the IDOC's handling of concerns and grievances he submitted that contained disrespectful language. Instead of completing the grievance procedure properly once, or even twice to be conscientious, he opted for completing only the first of three steps of the grievance procedure over and over again. He submitted two to four concern forms containing disrespectful language every day for six days, plus other similar forms submitted over the next weeks and months, for a total of 26 submissions. To IDOC employees, this confusing situation began to look more like a pattern of abuse of process, rather than the seeking of a legitimate solution to a legitimate problem.

The concerns, grievances, and appeals were handled by IDOC employees in different ways, which affects the outcome of the exhaustion question. The grievance

coordinator returned some grievances and told Plaintiff how to fix the issue to have the merits of his claims heard—remove the disrespectful language and resubmit the merits of the claims in respectful language. The warden also told him the same about a grievance appeal. Some employees returned concern forms to Plaintiff: sometimes with instructions to remove the disrespectful language and resubmit, sometimes with no instructions.

When Supervisor Husk discerned a pattern of inappropriate concern forms, he allegedly told his subordinates they could reject or destroy his concern form or grievances. Plaintiff alleges that three sets of grievance documents were thrown away by Defendants Chappelle and Olsen.

Plaintiff attempts to press his unique set of facts into the mold of two published cases addressing a prisoner's First Amendment right to be free from punishment for petitioning prison officials redress of conditions of confinement claims: *Bradley v. Hall*, 64 F.3d 1276 (9th Cir. 1995), *abrogated on other grounds by Shaw v. Murphy*, 532 U.S. 223 (2001), and *Brodheim v. Cry*, 584 F.3d 1262 (9th Cir. 2009). *Bradley* held that disrespectful language in a prisoner's grievance is itself protected activity under the First Amendment. 64 F.3d at 1281–82. In *Bradley*, the Ninth Circuit expressly stated: "Today we hold *only* that prison officials may not *punish* an inmate merely for using "hostile, sexual, abusive or threatening" language in a written grievance." *Id*. at 1282 (emphasis added).

*Bradley* did not address whether a prison policy could ask or require prisoners to rewrite grievances prior to processing them. *Bradley* did not address a direct right to petition claim apart from a retaliation context, that is, whether prison officials were free

to simply refuse to accept the grievances if they did not issue a warning, threat, or punishment with the rejection. Nor did *Bradley* address a situation where the inmate had filed multiple concerns with disrespectful language within the span of a few weeks, as here; rather *Bradley* centered on just one grievance.

In 2009, again in the context of retaliation, *Brodheim*'s holding was even narrower:

> The determination of an individual prisoner in persisting in filing grievances in spite of a threat of retaliation does not indicate he has not suffered a constitutional wrong. Even if the threat or warning is general and not carried out, a prisoner may prevail on a First Amendment claim if that threat would chill the protected activity of an ordinary prisoner.

*Id*. at 1273.

*Brodheim* did not address whether a prison policy could require prisoners to rewrite grievances as a prerequisite to processing them in situations where no warning or punishment was issued. As in *Bradley*, only one grievance was at issue in *Brodheim*.

*Bradley* and *Brodheim* constitute clearly established law governing claims for *retaliation* for prisoners' exercise of the right to free speech in the context of prison grievances. The content of the IDOC grievance policy reflects not that Idaho policymakers were "idiots," as Plaintiff contends, but it suggests that they interpreted *Bradley* and *Brodheim* narrowly.[1] That is, they construed them to apply only to the right

---

[1] "Broadly interpreting" cases for qualified immunity is contrary to United States Supreme Court precedent. *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015):

to be free from retaliation for submitting disrespectful grievances, not to any right to petition the government. Neither *Bradley* nor *Brodheim* addressed whether it was lawful to refuse to process or address the original grievance if the prisoner declined to rewrite it in respectful language.

In the midst of Plaintiff's flurry of concern forms, a Ninth Circuit panel issued an opinion about both the right to petition and the right to be free from retaliation—*Richey v. Dahne*, 733 F. Appx 88 (9th Cir. April 25, 2018).[2] *Richey* is an unpublished opinion. Ninth Circuit Rule 36-3 provides: "Unpublished dispositions and orders of this Court are not precedent…." 9th Cir. Rule 36-3 (citation of unpublished opinions). In *Hart v. Massanari*, 266 F.3d 1155 (9th Cir. 2001), the Ninth Circuit explained: "[T]he disposition [in an unpublished opinion] is not written in a way that will be fully intelligible to those unfamiliar with the case, and the rule of law is not announced in a way that makes it suitable for governing future cases." *Id*. at 1178.

_____

The dispositive question [for qualified immunity] is "whether the violative nature of *particular* conduct is clearly established." *Ibid.* (emphasis added). This inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (*per curiam*) (quoting *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)).

[2] Some of Plaintiff's claims arose before *Richey*, and some afterward. Resolution of the clearly-established law inquiry is governed by cases published before the alleged violation, but the court may "also examine cases published after the [alleged violation] to the extent they shed light on the fact that the law was not clearly established at the relevant time." *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1071 (10th Cir. 2009).

**MEMORANDUM DECISION AND ORDER - 8**

Plaintiff's reliance on *Richey* to question the intelligence of the IDOC officials is not as rock solid as he supposes. If unpublished cases are written in a manner that makes them unsuitable for governing future cases, *Richey* should not be considered clearly established law. Because it is unpublished, *Richey* has limited analysis. It is unclear which arguments were considered and rejected and, if so, on what grounds.

In *Richey*, the Ninth Circuit panel determined that *Brodheim* is to be "broadly interpreted"[3] to mean that (1) prison officials are permitted to ask a prisoner to rewrite a disrespectful grievance without violating the First Amendment, but, (2) if the prisoner refuses to rewrite it, to avoid a First Amendment violation prison officials must process the original grievance and address its substantive complaint, without regard to the disrespectful language. *Id.* at 883–84. The *Richey* court reasoned:

> The holding of *Brodheim* is not as narrow as Dahne contends. While it is true that *Brodheim* involved a warning or threat against a prisoner because of the content of a grievance, limiting *Brodheim* to only those types of cases would require that we ignore the *Brodheim* court's reasoning, and that we disregard the broader First Amendment framework under *Turner*. Instead, we consider that a correct reading of the scope of the holding in *Brodheim* is that rules prohibiting disrespectful language do not serve a legitimate penological interest in the special context of prison grievances.

*Richey*, 733 F. Appx at 883.

---

[3] The Ninth Circuit's approach to *Brodheim* appears contrary to *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018), at least for qualified immunity purposes. In Kisela, the Supreme Court noted that it had "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." (internal quotation marks omitted) (citing cases).

**MEMORANDUM DECISION AND ORDER - 9**

Without any published analysis on whether there exists a direct right to petition claim or any statement of what the elements of that claim are, the *Richey* panel decided that Dahne had violated Plaintiff's right to petition when Dahne did not process the original grievance when Richey refused to rewrite it to remove the offensive remarks. *See* 733 Fed. Appx. at 883-84. (Compare the extensive analysis done to come to the opposite conclusion by the district court in Plaintiff's Case 143, Dkt. 317.) Because of the many flaws in reasoning and the lack of analysis in *Richey*, this Court disagrees with Plaintiff that *Richey* constitutes any sort of clearly established law governing his case. There is no "robust consensus of cases of persuasive authority" that could "clearly establish the federal right [Plaintiff] alleges." *See Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

## STANDARDS OF LAW

### 1.  Summary Judgment

Defendants seek summary judgment on grounds of Plaintiff's failure to exhaust administrative remedies prior to filing suit and for failure to state a claim upon which relief can be granted. Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Rather, there must be no *genuine* dispute as to any *material* fact in order for a case to survive summary judgment. Material facts are those "that might affect the outcome of the suit." *Id.* at 248. "Disputes over

**MEMORANDUM DECISION AND ORDER - 10**

irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal quotation marks omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *So. Ca. Gas Co.*, 336 F.3d at 889.

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which [a] jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Affidavits or declarations submitted in support of or in opposition to a motion "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

**MEMORANDUM DECISION AND ORDER - 11**

If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e)(2). The Court must grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

The Court does not determine the credibility of affiants or weigh the evidence. Statements in a brief, unsupported by the record, cannot be used to create an issue of fact. *Barnes v. Indep. Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir. 1995). Although all reasonable inferences which can be drawn from the evidence must be drawn in a light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630-31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

## 2.  Exhaustion of Administrative Remedies

The Prison Litigation Reform Act of 1995 ("PLRA")[1] requires prisoners to exhaust all available prison administrative remedies before they can bring their claims in a new or ongoing civil rights lawsuit challenging the conditions of their confinement. 42 U.S.C. § 1997e(a). If a prisoner has failed to exhaust available administrative remedies, the appropriate remedy is dismissal without prejudice. *Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003), *overruled in part on other grounds by Albino*, 747 F. 3d 1162.

---

[1] Pub. L. No. 104-134, 110 Stat. 1321, *as amended*, 42 U.S.C. § 1997e, *et seq.*

**MEMORANDUM DECISION AND ORDER - 12**

"There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). Proper exhaustion is required "even where it may appear futile." *Nunez v. Duncan*, 591 F.3d 1217, 1231 (9th Cir. 2010) (quoting *Booth v. Churner*, 532 U.S. 731, 741 (2001)). The exhaustion requirement supports the important policy concern that prison officials should have "an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Jones*, 549 U.S. at 204.

The defendant bears the ultimate burden of proving failure to exhaust. *See Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005). If the defendant initially shows that (1) an available administrative remedy existed and (2) the prisoner failed to exhaust that remedy, then the burden of production shifts to the plaintiff to bring forth evidence "showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc).

## CLAIMS AT ISSUE

Plaintiff raises 26 instances in which concerns, grievances, or appeals were not processed in the prison grievance system because of disrespectful language.

### (1)   Dkt. 19, ¶ (1)

On January 10, 2018, Plaintiff submitted a concern form stating that a correctional officer should not have issued a C-Note for Plaintiff's use of allegedly disrespectful but protected speech in a prior concern form. Defendant McKay returned the concern form to Plaintiff. This is an alleged violation of the right to petition against McKay.

**MEMORANDUM DECISION AND ORDER - 13**

### (2)   Dkt 19, ¶ (2)

On January 12, 2018, Plaintiff submitted a concern form to the medical unit to grieve a medical issue. McKay returned it on the basis of disrespectful language, citing the grievance policy. This is an alleged violation of right to petition against McKay.

### (3)   Dkt 19, ¶¶ (3-6)

In February 2018, Plaintiff wrote a grievance complaining that prison officials should not reject grievances for containing disrespectful language. Defendant Emily Morrison, the facility grievance coordinator, rejected this grievance, and several more, saying, "I have been told to follow [the grievance policy addressing disrespectful language]." Plaintiff says that Morrison admitted to him in a verbal conversation that she had read case law and admitted that following such a policy is not a legal defense. Plaintiff sent Morrison a concern form documenting their conversation. She again said she had been told to follow the policy. The grievances were not processed. This is an alleged violation of the right to petition against Morrison.

### (4)   Dkt. 19, ¶ (7).

On January 14, 2018, Plaintiff wrote a concern form stating that the inmate accounting unit refused to provide him with an accounting statement. (He does not allege simply that he requested an accounting statement via a concern form, as Defendant construes the claim.) It was rejected by McKay for disrespectful language. Plaintiff did not rewrite it, and the concern form was not processed. This is an alleged violation of right to petition against McKay.

### (5)   Dkt. 19, ¶¶ (8-11).

On May 3, 2018, Plaintiff wrote Warden Christensen a concern form to notify him that staff were rejecting grievances for illegal reasons and in violation of *Richey v. Dahne*, 733 F. Appx. 881 (2018). Plaintiff wrote that the warden was "a 'stupid fuck'" for not looking up *Richey*. McKay returned the concern form with instructions to rewrite it to receive a response. Plaintiff did not rewrite it, and the grievances was not processed. This is an alleged violation of the right to petition and includes a supervisory liability theory of liability for failure to train and supervise against Christensen and McKay.

**MEMORANDUM DECISION AND ORDER - 14**

**(6)   Dkt. 19, ¶¶ (12-13)**

On April 11, 2018, Plaintiff attempted to grieve Defendant Morrison's position that a prisoner can harass a prison employee in a grievance by using disrespectful language, even if that employee had no personal notice of the grievance. McKay intercepted the form, returned it, and gave no response. It was not rewritten or processed. This is an alleged violation of right to petition and includes a supervisory liability theory of liability against McKay.

**(7)   Dkt. 19, ¶¶ (14-16)**

On May 16, 2019, Plaintiff sent a concern form to the mailroom grieving rejections of outgoing legal mail. Defendant Zudak returned the concern form, saying, "You need to address staff appropriately." It was not rewritten or processed. This is an alleged violation of right to petition against Zudak.

**(8)   Dkt. 19, ¶¶ (17-19)**

On May 27, 2018, Plaintiff sent a concern form to Warden Christensen: "Can you train your inbred idiots? To stop refusing food trays they issue to other cells and then retrieve after being in another inmate's cell?" Christensen returned the form to Plaintiff, saying: "You may resubmit with appropriate language." It was not rewritten or processed. This is an alleged violation of right to petition against Christensen.

The Court does not consider paragraph 19 as a separate claim, but as an allegation that supports the elements of the First Amendment right to petition asserted as the legal basis for many of his claims against Defendants.

**(9)   Dkt. 19, ¶¶ (20-21).**

On October 11, 2018, the prison paralegal returned Plaintiff's post-conviction petition which had been submitted for copying (no allegations are included about the context of why a copy was needed). The paralegal said it was not an access-to-courts issue and refused to copy it. Plaintiff alleges: "I sent him a concern trying to get him to realize he's an idiot and to copy it." McKay intercepted it and did not reply due to disrespectful language. It was not rewritten or processed. This is an alleged violation of the right to petition and includes a supervisory liability theory of liability against McKay.

### (10)   Dkt. 19, ¶¶ (22-23)

On January 1, 2019, facility grievance coordinator Morgan Kevan returned several unprocessed grievances to Plaintiff. They were grieving conditions of confinement, staff misconduct, staff refusing to process grievances, and Kevan's failure to correct and supervise subordinate employees. The grievances were not processed. This is an alleged violation of the right to petition and includes a supervisory liability theory against Kevan.

### (11)   Dkt. 19, ¶¶ (24-25)

In January 2019, Plaintiff grieved Kevan's actions of failing to permit Plaintiff to petition (grievance no. 180000050). Supervisor Kelsey Howard became aware of the subordinate's behavior (Kevan) and refused to correct it. Warden Blades and Deputy Warden McKay reviewed the grievance and failed to correct their subordinates' behavior. Morgan returned the unprocessed grievance to Plaintiff. This is an alleged violation of right to petition and includes a supervisory liability theory of liability against Morgan, McKay, and Blades.

### (12)   Dkt. 19, ¶ (26)

On February 16, 2019, Morgan returned an unprocessed grievance about prison conditions and staff misconduct to Plaintiff because Morgan's supervisor, Howard, determined that it contained disrespectful language. This is an alleged violation of the right to petition under a supervisory theory against Howard.

### (13)   Dkt. 19, ¶ (27)

On February 22, 2018, Morrison rejected a grievance submitted about conditions of confinement and staff misconduct because it contained personal attacks and harassment. This is an alleged violation of the right to petition against Morrison.

### (14)   Dkt. 19, ¶ (28)

On March 23, 2018, Warden Christensen refused to answer a grievance appeal and asked Plaintiff to resubmit it respectfully. A copy of the appeal is found at Docket 137-3, p. 2. This is an alleged violation of right to petition against Christensen.

**MEMORANDUM DECISION AND ORDER - 16**

**(15)   Dkt. 19, ¶¶ (29-31)**

On August 24, 2019, Defendant Radzyminski discovered Plaintiff' concern form that contains threatening language. Dkt. 137-2, p. 2.

**(16)   Dkt. 19, ¶ (33)**

Plaintiff alleges that Defendants Lau and Klingensmith "prevented [a] grievance from being filed and signed off on the infraction." These Defendants reviewed the Disciplinary Offense Report of Radzyminski and upheld it. McKay and Dietz also upheld it and failed to correct the behavior of subordinates. These are alleged violations of the right to petition and include a supervisory theory of liability against Lau, Klingensmith, McKay and Dietz.

**(17)   Dkt. 19, ¶ (34)**

On January 9, 2018, Correctional Officer Chappelle received a concern form and a letter from Plaintiff that complained of staff misconduct and conditions of confinement. She returned the concern form unprocessed for inappropriate language. Plaintiff explained his understanding of the law to her and gave the forms back to her. She threw them away in Plaintiff's presence, indicating that Lieutenant Husk authorized her to do so. The grievance was complaining staff misconduct and conditions of confinement. This is an allegation of a violation of the right to petition against Chappelle and Husk, and includes a supervisory theory of liability against Husk.

**(18)   Dkt. 19, ¶ (35)**

On January 8, 2018, Plaintiff passed four concern forms through his cell door, grieving conditions of confinement and staff misconduct of Chappelle. On Husk's orders, Correctional Officer Olsen took two and threw them away because of disrespectful language. This is an allegation of a violation of the right to petition against Olsen and of the right to petition against Husk, and includes a supervisory liability theory against Husk.

**(19)   Dkt. 19, ¶ (36)**

On January 10, 2018, Olsen ripped up and threw away two concern forms; she told him that if his concern forms contained disrespectful language, she could "trash them,"

**MEMORANDUM DECISION AND ORDER - 17**

on Husk's authorization. This is an allegation of a violation of the right to petition against Olsen and Husk, including a supervisory liability theory against Husk.

### (20)   Dkt. 19, ¶¶ (37-38)

On January 9, 2018, Plaintiff submitted a concern form grieving conditions of confinement and staff misconduct. Correctional Officer Held refused to process it because of disrespectful language. She threatened to file a C-note. This is an allegation of a violation of the right to petition and to be free from retaliation against Held.

### (21)   Dkt. 19, ¶¶ (39-40)

On January 8, 2018, Correctional Officer Sanabaria refused to process a concern form grieving conditions of confinement and staff misconduct. He returned it to Plaintiff unprocessed for inappropriate language, per Corporal Tramel's order. This is an allegation of a violation of the right to petition against Sanabaria and Tramel, including supervisory liability theories against Tramel.

### (22)   Dkt. 19, ¶¶ (41-42)

On January 11, 2018, Defendant Correctional Officer White refused to process a concern form because it contained harassing language. This is an allegation of a violation of the right to petition against White.

### (23)   Dkt. 19, ¶¶ (43-44)

On January 7, 2018, Defendant Correctional Officer Frahs refused to process two concern forms because of disrespectful language issues. This is an allegation of a violation of the right to petition against Frahs.

### (24)   Dkt. 19, ¶ (45)

On January 7, 2018, Defendant Janoushek refused to process four concern forms because of disrespectful language issues. This is an allegation of a violation of the right to petition against Janoushek.

### (25)   Dkt. 19, ¶ (46)

On January 8, 2018, Contreras refused to file two concern forms because of disrespectful language issues. This is an allegation of a violation of the right to petition against Contreras.

**MEMORANDUM DECISION AND ORDER - 18**

**(26)    Dkt. 19, ¶¶ (47-50)**

On January 10, 2018, Plaintiff sent Husk a concern form discussing Husk's alleged retaliation and his orders to subordinates permitting them to reject disrespectful grievances according to policy. On January 14, 2018, Husk returned a written reply in person, admitting in writing that he did instruct subordinates to reject disrespectful grievances. Husk told Plaintiff that if he continued to submit disrespectful grievances, Husk would take his privileges away. Several other Defendants told Plaintiff that Husk had authorized them to refuse to process or destroy his grievances and personal outgoing mail. These allegations state claims for violations of the right to petition, the right to send mail, and the right to be free from retaliation against Husk.

### REVIEW OF MOTION FOR SUMMARY JUDGMENT ON EXHAUSTION GROUNDS: OUTLINE OF CLAIMS THAT CAN AND CANNOT BE DECIDED ON THE CURRENT RECORD

In each of the 26 instances, Plaintiff complains that an IDOC employee violated his First Amendment right to petition the government by returning, throwing away, or refusing to process his grievance because of disrespectful language, or that a supervisor authorized a subordinate to do so. The Court's analysis and disposition of these claims can be categorized three ways:

### 1.   Concern and Grievance Forms with Unknown Content

Except as to one instance, neither party has produced the concern forms or grievances that were rejected by the IDOC as being contrary to the grievance procedure. In three other instances, Plaintiff has described the content sufficiently (and Defendants have not disputed the content) for the Court to make an exhaustion determination.

However, because the Court must apply the specific IDOC grievance procedure requirements to each concern form or grievance rejected and determine whether the

rejection met or did not meet the grievance procedure requirement, the Court must deny without prejudice Defendant's summary judgment motion where the content of the concern or grievance is unclear or unknown. For example, the grievance procedure specifies that "[i]f the language used in a concern or grievance form could constitute harassment or intimidation, the concern or grievance form will be returned unanswered along with a note indicating that the form can be resubmitted if written respectfully and/or appropriately." Grievance Policy, p. 7 (*see* Footnote 4). It is impossible for the Court to analyze whether Plaintiff's concerns and grievances met or did not meet this standard if it does not have them, especially given that Plaintiff now contests whether any form at issue was "disrespectful, harassing, vulgar, uncivil or in any way 'improper.'" See Dkt. 163-1, p. 2.

When grievances are rejected for procedural reasons, the Court is required to scrutinize the policy requirement and the grievance. *See Little v. Jones*, 607 F.3d 1245 (10th Cir. 2010). Rejections based on the published grievance procedure cannot be painted with a broad brush, but each particular provision that may apply must be identified and analyzed as an overlay to the content of the grievance at issue.

Accordingly, the Motion for Summary Judgment will be denied as to the following claims without prejudice for failure to meet the burden of proof that each concern form or grievance contained content that was contrary to the grievance procedure and therefore were properly left unprocessed: (1), (2), (3), (4), (6), (7), (9), (10), (11), (12), (13), (14), (16), (20), (21), (22), (23), (24), (25), and (26).

### 2.  Concern Forms Allegedly Destroyed by Officers

Plaintiff asserts that two Defendants allegedly threw away some of Plaintiff's concern forms upon authorization from a third Defendant. The three Defendants have not agreed with or denied this content. These concern forms obviously cannot be produced. An evidentiary hearing would be needed if these Defendants disagree with these allegations. The Motion for Summary Judgment will be denied as to the following claims without prejudice because it is unknown whether Defendants agree or disagree with the factual allegations: (17), (18), and (19).

### 3.  Concern, Grievance, and Appeal Forms with Known Content

The Court can perform the exhaustion analysis on claims for which the content is known: (5), (8), and (14). Claim (15) has known content but falls under a separate analysis for failure to state a claim based on threatening content. These analyses follow below.

### PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE

Plaintiff has filed a statement of material facts in dispute. Dkt. 163-1. The few that relate to facts are addressed herein. Most of his "facts" relevant to the analysis of the four claims on which Defendants prevail are actually mixed questions of law and fact, for example, whether Plaintiff failed to comply with the grievance policy. The Court agrees with Defendants that Plaintiff's factual contention is not that he completed all three grievance procedure steps, but that his chosen conduct satisfied the exhaustion requirement even though he did not complete all three steps. *See* Dkt. 67, p. 12 n. 7. This

is not a material fact in dispute, but a mixed question of law and fact to be determined by the Court on summary judgment. When a mixed question of fact and law involves undisputed underlying facts, summary judgment is appropriately granted. *Union School Dist. v. Smith*, 15 F.3d 1519, 1523 (9th Cir.1994), *cert. denied*, 513 U.S. 965 (1994).

The specific question in this case is one of first impression: if a prison grievance procedure contains an allegedly unconstitutional requirement, must the prisoner use that allegedly unconstitutional procedure to exhaust his complaint that the procedure is unconstitutional, or should the prisoner be able to bypass it because he believes it is unconstitutional? This is purely a question of law. Because the Court decides that question in the affirmative, it can properly address the mixed questions of fact and law.

## REVIEW OF SUMMARY JUDGMENT ON CONCERN, GRIEVANCE, AND APPEAL FORMS WITH KNOWN CONTENT: CLAIMS (5), (8), (14) (15).

The first question is whether Plaintiff's claims are subject to the exhaustion requirement. In *Porter v. Nussle*, 534 U.S. 516 (2002), the Supreme Court held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.* at 532. Moreover, "the PLRA prevent[s] a court from deciding that exhaustion would be unjust or inappropriate in a given case." case. *Ross v. Blake*, 578 U.S. 632, 641 (2016).

Claim (5) is a claim about not processing a concern form about staff who were rejecting grievances for illegal reasons. Claim (8) was a claim about not processing a

concern form about comingling used food trays among inmates. Claim (14) is that the warden would not address a grievance appeal because the grievance appeal contained disrespectful language; the underlying grievance was about the grievance coordinator failing to process a claim that contained personal attacks and harassing comments about staff.

The Court concludes that these three complaints about grievance content, acceptance, and processing each can be classified as a "suit about prison life." *Id.* The grievance system is an important tool for addressing legitimate prisoner complaints. It is also a category of acceptable subject matter for IDOC grievances. *See* Grievance Procedure, p. 6 (Footnote 4).

The second question is whether a special exception applies to Plaintiff's claims because Plaintiff believed the grievance policy itself was unconstitutional. That question has been answered by the United States Supreme Court. "Courts may not engraft an unwritten 'special circumstances' exception" to excuse a prisoner's failure to follow prison policies governing administrative remedies "onto the PLRA's exhaustion requirement." *Ross v. Blake*, 578 U.S. 632, 748 (2016). Rather, the Supreme Court observed, "[t]he only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'" *Id.*

Defendants argue that "Plaintiff's rule would create a standing exception to the PLRA's exhaustion requirement for all First Amendment suits directed at prison grievance procedures." Dkt. 169-1, p. 15. The Court agrees that the law does not permit a "special circumstances" exception for Plaintiff's complaints.

**MEMORANDUM DECISION AND ORDER - 23**

Plaintiff argues that his unique subject matter requires application of an exception to the plain exhaustion rule. In *Ross*, the Court foreclosed that option, emphasizing that courts are not permitted to "add unwritten limits onto" the statute's "rigorous textual requirements." 578 U.S. at 639–40 (internal citations omitted). In *Woodford*, the Court rejected the dissent's assertion that "[b]ecause respondent has raised constitutional claims," he was entitled to bypass the prison administrative remedy procedures. 548 U.S. at 91 n.2. The majority responded: "[W]e fail to see how such a carve-out would serve Congress' purpose of addressing a flood of prisoner litigation in the federal courts, when the overwhelming majority of prisoner civil rights and prison condition suits are based on the Constitution." *Id.* (internal citation omitted).

In *Ross*, the Court firmly reiterated that even prisoner mistakes about the grievance system do not warrant excusing the exhaustion requirement, and that courts are not required to "look to all the particulars of a case" to decide whether to excuse a failure to exhaust available remedies" because "such wide-ranging discretion 'is now a thing of the past.'" 578 U.S. at 641 (internal citation omitted).

The third question is determining what "proper exhaustion" entails. "Proper" exhaustion of administrative remedies means that the prisoner must comply "with [the prison's] deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

Because there "is no express federal law describing the procedural requirements with which prisoners must comply in satisfying § 1997e(a)'s exhaustion requirement,"

**MEMORANDUM DECISION AND ORDER - 24**

the procedures contained in a prison's administrative grievance policy serve as the measure for whether an inmate has properly exhausted his administrative remedies. *Id.* at 90-91. In *Porter v. Nussle*, the Court recognized that the PLRA now forbids federal courts from questioning whether state standards are acceptable to a federal court or whether the case should be exempted from the state administrative exhaustion system for even the most important of reasons. 534 U.S. at 523 ("Exhaustion under the 1980 prescription was in large part discretionary; it could be ordered only if the State's prison grievance system met specified federal standards, and even then, only if, in the particular case, the court believed the requirement appropriate and in the interests of justice.") (internal quotation marks omitted).

The Supreme Court has clarified that all available state administrative remedies must be exhausted, *not just those that meet federal standards*." *Woodford*, 548 U.S. at 85 (emphasis added). In the pre-PLRA exhaustion statute, 42 U.S.C. § 1997e, exhaustion was discretionary, and the United States Attorney General was required to "promulgate minimum standards for the development and implementation of a plain, speedy, and effective system for the resolution of grievances" in correctional facilities. 42 U.S.C. § 1997e(b) (1994). The minimum standards in the statute included only five items: an advisory role within the system, time limits, emergency measures, protection against retaliation, and independent review. Because the "federal standards" in the old version of the statute included First Amendment protection from retaliation, and the PLRA requires that state remedies that do not include this important protection still must be followed, it is clear that, even if a state remedy did not include First Amendment free speech

protection, a prisoner could not use that as an excuse to bypass the exhaustion requirement.

*Woodford* stated that a prisoner must comply "with an agency's deadlines and other critical procedural rules." *Id.* at 90-91. A prisoner cannot satisfy the PLRA's exhaustion requirement by filing "an untimely or *otherwise procedurally defective* administrative grievance or appeal." *Id.* at 83–84 (emphasis added). These statements are unclear. One interpretation of the *Woodford* proper exhaustion explanation is that compliance with *only* critical procedures is required, and compliance with non-critical rules is not. *See* Karen M. Harkins Slocomb, *How the Court Got It Wrong in Woodford v. Ngo by Saying No to Simple Administrative Exhaustion Under the PLRA*, 44 San Diego L. Rev. 387, 421 (2007) (arguing that only critical procedures require compliance, but that the Supreme Court has not provided "a brightline definition of 'critical procedural rules,' and its holding leaves administrative procedure to the discretion of the individual prisons").

The other view is that compliance with all of the procedural rules*, especially but not limited to*, critical ones, is required. For example, the United States District Court for the District of Colorado reasoned that the *Woodford* Court neither defined "critical," nor distinguished between "critical" and "non-critical" procedures," and therefore compliance with all of the agency's exhaustion procedures was required. *Jones v. Bradshaw*, No. 19-CV-01092-MEH, 2019 WL 5549164, at *4–5 (D. Colo. Oct. 25, 2019). The *Jones* court concluded that the prisoner's "attempt to carve out an exception

**MEMORANDUM DECISION AND ORDER - 26**

to proper exhaustion by limiting it to compliance with only 'critical' procedural rules

contravenes" *Woodford* and *Ross*. *Id*. at *5.

     This Court agrees that a prisoner should comply with all procedural requirements

of a state administrative remedy system, and that "procedural requirements" should be

interpreted to broadly encompass any requirement of the grievance procedure. For

example, it would cause a mass of confusion if the courts carved out exceptions for

grievance procedure requirements that were more language- or content-based, like no

disrespectful language, no substantial threats, no abuse of the grievance system, and

which categories of claims may be grieved versus requirements more traditionally

considered "procedural," such as time limits, page limits, and deadlines.

     Finally, if there is any doubt whether Plaintiff's case should be subjected to the

PLRA exhaustion requirement, the United States Supreme Court has identified all of the

following as purposes or goals of the PLRA's mandatory exhaustion rule:

- Exhaustion "protects 'administrative agency authority.'" *Woodford*, 548 U.S. at 89.

- "Exhaustion gives an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court.'" *Id*.

- Exhaustion "discourages disregard of the agency's procedures." *Id*. at 89 (internal quotation marks and alterations omitted).

- Exhaustion "promotes efficiency. *Id*. "Claims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." *Id*.

**MEMORANDUM DECISION AND ORDER - 27**

- Proper exhaustion reduces the quantity of prisoner suits because some prisoners are successful in the administrative process, and others are persuaded by the proceedings not to file an action in federal court. *Id*. at 89.

- "[P]roper exhaustion improves the quality of those prisoner suits that are eventually filed because proper exhaustion often results in the creation of an administrative record that is helpful to the court. When a grievance is filed shortly after the event giving rise to the grievance, witnesses can be identified and questioned while memories are still fresh, and evidence can be gathered and preserved." *Id*. at 94–95.

Here, a fully developed administrative record might have avoided litigation if Plaintiff had followed the prison rules to bring his issue to the attention of prison officials. He did not. Consider all of the government employee time spent on handling 26 separate grievances in a matter of weeks, and all of the Court time involved in a litigation involving 26 claims rather than one. Had Plaintiff properly followed one grievance through to completion, he could have either received a resolution after that and avoided a lawsuit, or he could have filed his suit immediately. Clearly, the purposes of the PLRA exhaustion requirement would have been met had Plaintiff exhausted his claim even once.

The fourth question is determining the state's standards for exhaustion. The following facts about the relevant procedures are undisputed. There are three stages in the IDOC grievance process. First, an inmate with a concern must seek resolution of the problem by filling out an offender concern form, addressed to the proper staff member. If the issue cannot be resolved through the use of a concern form, the inmate must then file a grievance form. The grievance is then resolved by a Level 1 Initial Response, which is

reviewed in a Level 2 Reviewing Authority Response, and then returned to the inmate. If

the grievance did not resolve the issue satisfactorily, the inmate must file an appeal,

which is reviewed and a final decision issued in a Level 3 Appellate Authority Response.

When all three of these steps—concern form, grievance form, and grievance appeal—are

completed, the administrative grievance process is exhausted. Dkt. 129-1, pp. 8-9.[4]

Other relevant portions of the grievance procedure are:

> Grievance/appeal forms must be handwritten and legible. A
> Grievance/Appeal Form that is difficult to read or understand
> may be returned to the offender with instruction to make it
> legible or clearly explain the issue. As applicable, the
> grievance and/or appeal must (a) contain a reasonable and
> clear description of the problem and (b) contain specific
> information such as dates, places, and names. The description
> of the problem must be (a) written within the appropriate area
> of the Grievance/Appeal Form, and (b) civil, concise,
> understandable, and to the point. Vague issues/complaints,
> offender personal attacks on staff (e.g., the use of profanity or
> name-calling), or harassment of staff will be cause for staff to
> not accept the grievance. (Also see the main section 5.) If
> staff decides it is necessary to obtain more information, a staff
> member may interview the offender or request additional
> written explanation.

Grievance Policy, p. 9 (*see* Footnote 4).

> Offenders must also refrain from using concern and grievance
> forms to harass or intimidate a staff member. If the language
> used in a concern or grievance form could constitute
> harassment or intimidation, the concern or grievance form
> will be returned unanswered to the offender along with a note
> indicating that the form can be resubmitted if written
> respectfully and/or appropriately. When a concern or
> grievance form is returned for any of these stated reasons, the

---

[4] The public prison grievance system policies and procedures can be found at this link:
http://forms.idoc.idaho.gov/WebLink/0/edoc/281409/Grievance%20and%20Informal%20Resolution%20
Procedure %20for%20Inmates.pdf (accessed March 29, 2023).

> return itself shall not constitute the offender using a 'no
> response' action as described in the below subsections to
> begin the grievance process.

*Id.*, p. 7.

> Vague issues/complaints, offender personal attacks on staff
> (e.g., the use of profanity or name-calling), or harassment of
> staff will be cause for staff to not accept the Offender
> Concern Form. (Also, see the main section 5.)

*Id.*, p. 8.

The fifth question is whether Plaintiff had the ability to exhaust. An example of

one of Plaintiff's grievances is No. IC 180000227, dated 03/06/18. Dkt. 137-3, p. 2. The

initial grievance respectfully grieved a prison conditions issue: he complained that Emily

Morrison, the grievance coordinator, unlawfully refused to process a grievance because it

contained personal attacks and harassment against staff members. In respectful language,

Plaintiff proposed a solution of firing Morrison and paying Plaintiff compensation. *Id.*

Morrison answered the grievance in a respectful manner and in accordance with the

prison grievance policy, stating, "I will process any grievance within the guidelines of

policy. I am here to help you find resolutions. Please note some information below to

help us process your grievances." *Id.* Morrison then cited the policy indicating that

disrespectful grievances will be returned with a note to rewrite them before they are

processed. *Id.*

The reviewing authority, Deputy Warden Timothy McKay, denied the grievance

for two reasons: (1) staffing matters are beyond the scope of the grievance process

(apparently focusing on the proposed solution of firing Morrison); and (2) "requiring you

**MEMORANDUM DECISION AND ORDER - 30**

to follow an SOP which you do not agree does not entitle you to compensation." *Id.*, p. 3.

Plaintiff then drafted his grievance appeal to the warden:

> (So you all do not care what the law says?) Lawless
> shits yes, and as noted Brodheim v Cr 384 F3d 1262 and
> many others your policy violates the constitution and as such
> Is not a defense for qualified community – new the suit 2
> failed was assigned to that foul dirty Judge windmill who
> temp. dismissed it contrary to the law but it will get nut suck
> in so have fun for new you filthy criminals. Obviously once
> the 9th cir reviews it will se back on A long process 2 have
> resolve that bitch criminal of a Judge Windmill (your Pal)
> will not stop you all being held liable
>
> This aint my first rodeo-game on punks and can Mckay speak
> intelligibly please what does that idiot mean anyway?

Dkt. 137-3, p. 3 (verbatim from typed grievance form).

Warden Jay Christensen wrote back that an appeal could be resubmitted if written respectfully. *Id.* This particular series of communications shows that Plaintiff did have the ability to rewrite a grievance in a respectful manner.

The sixth question is whether Plaintiff was free to ignore the requests of prison officials to rewrite the grievances and appeals respectfully if he desired a merits review of his claims. In *Ross*, the Court explained that a prisoner "is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" 578 U.S. at 642-43 (citing *Booth,* 532 U.S. at 737-38). "Unavailability" must be determined by the parameters of the institution's published grievance system and its "real-world workings," meaning how it is actually applied in the prison. *Id.* at 643. Defendants argue that Plaintiff's facts are like those in *Sapp v.*

MEMORANDUM DECISION AND ORDER - 31

*Kimbrell*, 623 F.3d 813 (9th Cir. 2010), where the court observed that given "the repeated

screenings, Sapp could have no reasonable belief that administrative remedies were

effectively unavailable. Kimbrell specifically instructed Sapp on how to seek medical

care, and on how to appeal any denial of care, but Sapp did not follow those

instructions." 623 F.3d at 826. Similarly, in this context, Defendants assert, Plaintiff

"could have no reasonable belief that administrative remedies were effectively

unavailable to him." *See id*. Defendants argue:

> Unavailability means the prisoner is unable, not
> unwilling, to exhaust his claims, meaning he is unable, not
> unwilling, to present the merits of his claims for review. *Id*.,
> p. 13. "Plaintiff makes no allegation in this lawsuit that any
> Defendant failed to accept a concern or grievance that
> complied with IDOC's policy or that any Defendant even
> suggested they would not accept a properly drafted grievance.
> Nor does Plaintiff that Defendants "failed to response" to any
> properly filed concern forms or grievances. Plaintiff does not
> allege that IDOC officials used trickery or deceit to prevent
> him from seeking any administrative remedy.

Dkt. 159-1, pp. 13-14. This argument makes abundant sense as to the four claims at issue.

Because Plaintiff asserts that prison officials blocked his concern forms,

grievances, and grievances appeals from being heard, the Court examines each of the

three *Ross* exceptions as applied to Plaintiff.

<u>Exception 1: the specified procedure results in a dead end</u>

*Ross* explained that "an administrative procedure is unavailable when (despite

what regulations or guidance materials may promise) it operates as a simple dead end—

with officers unable or consistently unwilling to provide any relief to aggrieved inmates."

578 U.S. at 643 (citing *Booth*, 532 U.S. at 736). The Supreme Court gave an example of

**MEMORANDUM DECISION AND ORDER - 32**

application of this exception: "a prison handbook directs inmates to submit their grievances to a particular administrative office—but in practice that office disclaims the capacity to consider those petitions." *Id*. Such a system is "not 'capable of use' for the pertinent purpose." *Id*. (quoting *Booth,* 532 U.S. at 736). Another example is that, "'where the relevant administrative procedure lacks authority to provide any relief,' the inmate has 'nothing to exhaust.'" *Id*. (citing *Booth,* 532 U.S. at 736 and n. 4). A third example is where "administrative officials have apparent authority, but decline ever to exercise it." *Id*. (quoting *Booth*, 532 U.S. at 738). However, this exception is narrow, because "available" means only that there must be "the possibility of some relief." *Id*. (citing *Booth*, 532 U.S. at 738).

The United States District Court for the Southern District of Mississippi analyzed and rejected application of this exception in *Hinton v. Martin*, No. 3:16-CV-616-TSL-JCG, 2019 WL 3756480, at *4 (S.D. Miss. May 14, 2019), *report and recommendation adopted*, No. 3:16CV616TSL-RHW, 2019 WL 3754919 (S.D. Miss. Aug. 8, 2019). There, Hinton's original grievances were returned to him as procedurally improper at the first stage of the process. Instead of filing a "corrected, procedurally proper grievance before filing suit," *id*., at *4, Hinton asserted that he submitted what he considered to be "streamlined grievances" to the prison during the pendency of his court action. *Id*. at *2. Because the grievances were rejected on procedural grounds, the court concluded: "The rejection of Hinton's grievances on procedural grounds alone does not provide evidence of unavailability under *Ross'* first exception." *Id*. at *4. The first *Ross* exception did not apply because there was "no evidence indicating that the grievance procedures operated

as a 'simple dead end' for Hinton." *Id.* Rather, he simply refused to comply with the administrative grievance procedures as written.

Similarly, here, this exception does not apply to Plaintiff, because the IDOC grievance system does offer a real remedy and sets forth clear rules for prisoners to access the remedies. Like Hinton, Plaintiff simply refused to follow the rules to complete the grievance policy. Prison employees continually notified Plaintiff that, to access the remedies, he need only delete the disrespectful language from his grievances. The evidence shows that he could have rewritten his grievance and it would have been accepted and proceeded through the grievance system, which does offer at least some of the relief sought—a change of policies and procedures.

<u>Exception 2: a procedure that no ordinary prisoner can discern or navigate</u>

The second exception is that prisoners are excused from using the grievance procedure if it is so complex or unwieldy that they cannot figure out how to use it. In *Ross*, the Supreme Court explained that a grievance procedure deemed "unavailable" includes one so "opaque" and "confusing" that it is practically "incapable of use," or one that is "essentially 'unknowable'—so that no ordinary prisoner can make sense of what it demands." 578 U.S. at 644. Importantly, *Ross* rejected the Fourth Circuit's interpretation that a grievance procedure is "unavailable" if it is not "sufficiently 'plain' as to preclude any reasonable mistake or debate with respect to their meaning." *Id.* at 644. The bottom line is that "[w]hen an administrative process is susceptible of multiple reasonable interpretations, Congress has determined that the inmate should err on the side of exhaustion." *Id.*

**MEMORANDUM DECISION AND ORDER - 34**

Here, the grievance procedure required Plaintiff to avoid using language that "could constitute harassment or intimidation" toward a staff member. Grievance Procedure, p. 7. The grievance procedure also provides that "offender personal attacks on staff (e.g., the use of profanity or name-calling), or harassment of staff will be cause for staff not to accept the Offender Concern Form."[5]

In Claim (5), Plaintiff wrote, "the warden is a stupid fuck." In Claim (8), Plaintiff wrote, "Can you train your inbred imbeciles?" In Claim (14), Plaintiff called prison staff "lawless shits," "filthy criminals," "punks," and "idiot[s]." These words clearly are classifiable as profanity, name-calling, and/or personal attacks on staff. Plaintiff's attempt to raise a question that they are not does not create a genuine dispute of material fact. There is nothing hard to understand about this portion of the grievance procedure. In each of the three instances, Plaintiff received a clear instruction back from the prison pointing

_____

[5] Interestingly, the prison has moved away from calling convicted felons "offenders" and now uses words like "resident/client." Hence, the "Offender Search" on the IDOC website is now the "Resident/Client Search." See https://www.idoc.idaho.gov/content/prisons/resident-client-search (accessed March 29, 2023). This may also be time for the law to move away from the assumption that an IDOC resident's negative labels attributed to staff are not psychologically damaging. In *Bradley*, the court reasoned that it should be an easy task for the prison to screen the verbally abusive language from the staff being verbally abused:

> It takes little imagination to structure a grievance system and regime of disrespect rules that would make a prisoner's statements in a complaint or grievance invisible to all those involved in the daily operations of the prison, alleviating any security concern. A prisoner's statement in a grievance need not have any more impact on prison security through the maintenance of respect than the prisoner's unexpressed thoughts.

64 F.3d at 1281. This suggestion directly contravenes a basic principle of problem-solving that problems should be first raised at "the most decentralized level as is reasonably possible." See 42 U.S.C. § 1997e (1994). This solution also does not work because the verbally abused staff is sometimes the ultimate grievance appeal authority.

out the violation and requesting that the merits of the claim be rewritten without the offensive language.

In short, the prison grievance system's specific points are simple to use. Plaintiff refused to follow the simple procedures, even after being told in writing that his grievances *would* be accepted for processing if he would only rewrite them without the disrespectful language. The example grievance to Morrison shows that he knew how to submit respectful grievances, and that removing the disrespectful content did not detract from the subject matter of the grievance or make it impossible for him to articulate his issue.

### Exception 3: thwarting prisoner by use of machination, misrepresentation, or intimidation

The third exception is that exhaustion is excused if "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 644. Examples include procedural systems devised "to "trip up all but the most skillful prisoners." *Id*. (internal quotation marks and alterations omitted). Or in instances where "officials misled or threatened individual inmates so as to prevent their use of otherwise proper procedures." *Id*. In clear instances where prison employees' "interference with an inmate's pursuit of relief renders the administrative process unavailable," this exception to exhaustion applies. *Id.*

"Thwarting" has been identified in situations where officials "do not simply frustrate the prisoner's attempts at exhaustion; they 'defeat' or 'successfully' oppose the prisoner's attempts." *Morris v. Washington*, No. 2:21-CV-10404, 2022 WL 1817736, at

*4 (E.D. Mich. May 9, 2022) (relying on *Ross*, 578 U.S. at 642, 644), *report and recommendation adopted*, No. 21-10404, 2022 WL 1819034 (E.D. Mich. June 2, 2022).

In Plaintiff's case, the issue is whether requiring compliance with the no-disrespectful-language provision of the grievance procedure equaled a "thwarting" of Plaintiff's ability to use the grievance system. The facts do not seem to support application of this exception.[6] Prison officials very clearly expressed to Plaintiff that they would accept his concern forms and grievances if he rewrote them to omit the disrespectful language. These facts show that Plaintiff was not thwarted from using the then-current grievance system to bring his First Amendment claims. Had Plaintiff tried to do this, and the grievance was *then* rejected, then it might be considered a thwarting. *Id.*, 548 U.S. at 87–88.

Plaintiff argues that he was "stopped" from moving through the grievance system or that his many concern forms were "killed" before complete exhaustion was accomplished, each time they were returned to him, because of the disrespectful language. *See* Reply, Dkt. 128. As to these three claims, this argument is foreclosed by United States Supreme Court precedent requiring inmates to use the current grievance procedures as they exist at the time of the submission to fully and properly exhaust his administrative remedies. It was not only possible but easy for Plaintiff to follow the

---

[6] To the extent that Plaintiff is arguing that he was "thwarted" because the grievance policy says that prisoners can resubmit disrespectful grievances only "if" they rewrite them in a respectful manner (and therefore the prisoner who refuses to rewrite a disrespectful grievance is foreclosed from using the grievance system 100% of the time), that does not fit into the Supreme Court's description that the thwarting must be by machination, misrepresentation, or intimidation.

procedures. He chose not to, precluding his claims from reaching prison officials for review and remedy.

Here, it was *Plaintiff's* refusal that stopped or thwarted exhaustion. Like the Tenth Circuit in *Hinton*, this Court rejects the argument that "[i]nmates do not have to properly complete the grievance process, and they do not have to correct deficiencies." *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002).

In another similar case where a prisoner asserted that he was excused from continuing with grievance appeals after he did not receive a response, the court reasoned that the prisoner was not excused from skipping administrative appeals simply because the grievance chairman told him his grievance might be delayed for months for a further investigation. *Bell v. Campbell*, 43 Fed. Appx. 841, 842-43 (6th Cir. 2002). After he received that information, the prisoner made no attempt to move the grievance to the next stage of grievance proceedings, which foreclosed his ability to claim that the grievance procedure was "unavailable." *Id*.

Contrast the facts of this case—where Plaintiff was invited to resubmit the grievance in compliance with the policy—with *Pavey v. Conley*, 663 F.3d 899, 906 (7th Cir. 2011), where the court held that "if prison officials misled [a prisoner] into thinking that ... he had done all he needed to initiate the grievance process," then "[a]n administrative remedy is not 'available'"; *Tuckel v. Grover*, 660 F.3d 1249, 1252-53 (10th Cir. 2011), where the court held that "when a prison official inhibits an inmate from utilizing an administrative process through threats or intimidation, that process can no longer be said to be 'available'"; and *Goebert v. Lee County*, 510 F.3d 1312, 1323 (11th

**MEMORANDUM DECISION AND ORDER - 38**

Cir. 2007), where the court held that if a prison "play[s] hide-and-seek with administrative remedies," then they are not "available".

Bypassing the grievance process is a serious matter that is disruptive to the entire administrative remedy system. The *Woodford* Court explained that, if prisoners desired to and were permitted to bypass "available administrative remedies," they could simply file a late grievance. Even if prison officials decided to accept the late grievances, prisoners could still bypass the system "by violating other procedural rules until the prison administration ha[d] no alternative but to dismiss the grievance on procedural grounds." 548 U.S. at 95. "We are confident that the PLRA did not create such a toothless scheme," the *Woodford* Court concluded. *Id*.

This strict rule was applied in an Eastern District of California case, where a prisoner argued that presentation of his claims in letters to the agency that were acted upon equaled proper exhaustion, despite the availability of a prison grievance system. Those efforts did not amount to proper exhaustion, because "the courts cannot countenance an inmate's intentional noncompliance with the administrative appeals process or critical steps within it." *Cervantes v. Lindsey*, No. 116-CV-00343-BAMPC, 2017 WL 1356064, at *3 (E.D. Cal. Jan. 27, 2017) (citing *Woodford*, 548 U.S. at 95-96).

Defendants accurately point out that prison officials did not thwart Plaintiff, but actually aided him, telling him the way to correct his concern forms, grievances, and appeals to meet the procedure's requirements and have the merits of his claims addressed. Dkt. 159-1, p. 13.

**MEMORANDUM DECISION AND ORDER - 39**

Here, Plaintiff had a simple way to bring his First Amendment issues to the attention of prison officials. The record reflects that he was instructed how to do this. Moreover, he demonstrated that he knew how to do this in the first correspondence with Morrison in the sample grievance set forth above. That grievance shows that Plaintiff knew exactly how to submit a respectful administrative form asserting that the "disrespectful language" provision of the prison grievance policy was unconstitutional. He could have done so on appeal, as Warden Christensen asked him to do, consistent with the available grievance procedures then in place.

Prison officials' refusal to process the concern forms and grievances is but one of Plaintiff's "thwarting" assertions. Plaintiff also makes various vague allegations that he was in danger of being killed if he attempted to properly exhaust the grievance system. Dkt. 133. The Court required Plaintiff to state under oath, the "who, what, where, and when" of these allegations as to each of his counter-defenses. Dkt. 147. Plaintiff has not done so. Therefore, the Court concludes that these allegations are unsupported by any facts and are therefore frivolous.

Plaintiff also alleges that "as a direct result of filing this lawsuit over being denied exhaustion rights, [he] was repeatedly raped, starved literally to death twice (revived), kept in a strip cell for a year, denied hygiene for a year, denied contact with family anyone for year, denied access to courts for a year, his appeal of a life sentence defaulted likely." Dkt. 133, p. 6 (verbatim). Again, Plaintiff was ordered to be more precise in an affidavit to support these allegations. Plaintiff was also notified to make clear the distinction between what happened as "a direct result of filing this lawsuit," which would

**MEMORANDUM DECISION AND ORDER - 40**

not be a reason why Plaintiff did not exhaust his administrative remedies *before* filing this lawsuit. Plaintiff has not provided any supporting facts or explanation. Therefore, the Court concludes that this that these allegations are frivolous and unsupported by any facts.

Further, it is clear from the entire record that Plaintiff simply chose not to proceed any further with his concern forms as part of a plan to bring a lawsuit against the employees who did not accept them. Plaintiff cannot now backpedal and attempt to state that he desired or tried to complete the grievance process but could not because of threats, punishment, or conditions of confinement unsupported by the facts.

## REVIEW OF SUMMARY JUDGMENT
## ON PROTECTED SPEECH DEFENSE: CLAIM (15)

In its previous Order, the Court noted that an important issue for summary judgment or trial as to Plaintiff's retaliation claim against Radzyminski was whether the grievance constituted a threat, or fits within another exception, to remove it from First Amendment protection.

Defendants assert, and the Court agrees, that the concern form of August 24, 2019, is not protected speech, and therefore Claim (15) is subject to summary judgment. Radzyminski found the unprocessed concern form addressed to McKay on the staff desk, describing it as follows:

> In the concern form Williams demanded that his sanctions of 60 commissary and 60 property be lifted immediately. Williams went on to state that he is a lifer and these sanctions don't mean anything to him and that he did 9 years in ad seg without any property. He then stated: "If the

**MEMORANDUM DECISION AND ORDER - 41**

> meaningless sanctions are not lifted in 3 days out of principal
> [sic] … I'll never warn you idiots again…Trust me."
> Williams then went on to state that, "It may take time but I
> will get revenge you can't comprehend right now." All of this
> was done in a blatant attempt to harass and intimidate staff
> through words to get the sanctions removed.

Dkt. 137-2, p. 2.

The basic right to be free from retaliation associated with the submission of disrespectful grievances was clearly established after *Bradley* and *Brodheim*. It was and is clear that prison officials are not permitted to warn prisoners of punishment or punish them for disrespectful language in their grievances, and that a warning or punishment may constitute retaliation for the exercise of First Amendment rights. *Bradley* clarified that an exception to that rule is when disrespectful language constitutes "a substantial threat to security and discipline." 584 F.3d at 1273.

The Court concludes that there is no genuine dispute as to any material fact here. As Defendants describe it, "[b]ased both on the content of the concern form and the context in which Plaintiff made those statements, Plaintiff intended corrections officers to see the threat and to take it seriously, either in the hope that he would have his sanctions removed or because he was motivated to simply harass staff out of frustration that he was subject to sanctions." Dkt. 159-1, pp. 16-17. The Court agrees that there is simply no other way to construe Plaintiff's words, which have a menacing tone and could reasonably be interpreted to mean that Plaintiff intends to inflict bodily harm upon Defendants. For these reasons, Defendant Radzyminski is entitled to summary judgment

on Claim (15), a retaliation claim. It will be dismissed for failure to state a claim upon which relief can be granted.

## SUMMARY AND CONCLUSION

Defendants have not met their burden of proof on the exhaustion issue on the majority of the claims. Those claims will be dismissed without prejudice. Some of the claims have factual content that is neither disputed nor undisputed as to whether IDOC employees threw away Plaintiff's grievances. Those claims also will be dismissed without prejudice.

Three of Plaintiff's claims will be dismissed without prejudice on failure to exhaust grounds. One claim will be dismissed with prejudice for failure to state a claim because language that is a substantial threat is not protected speech.

## ORDER

**IT IS ORDERED:**

1. Defendants' Motion for Summary Judgment (Dkt. 159) is GRANTED in part: Claims (5), (8), and (14) are DISMISSED without prejudice, and Claim (15) is DISMISSED with prejudice. The Motion is DENIED in part as to all other claims.

2. Defendants shall give Plaintiff notice whether they intend to assert any or all of the different formulations of qualified immunity (traditional lack of clearly established governing law[7] and/or non-policymaking employees relying on policies[8]) and the

---

[7] *See* analysis in Dkt. 317 in Case 143.

[8] Where a defendant acts pursuant to official government policies, he or she may be entitled to qualified immunity. *See Saved Mag. v. Spokane Police Dep't*, 19 F.4th 1193, 1200 (9th Cir. 2021), *cert. denied*,

parties shall determine whether any limited discovery on qualified immunity grounds is appropriate.

3. After consulting with Plaintiff, Defendants shall submit a joint proposed timeline for qualified immunity discovery and summary judgment motions, not to exceed six months in total length (or each side may submit their own if no agreement). If Defendants are not going to assert qualified immunity defenses next, then the parties should determine discovery and dispositive motions deadlines, not to exceed six months in total length, and notify the Court of proposed timeline(s). The Court will then consider the parties' recommendations and set case deadlines. The parties are reminded that qualified immunity applies only to individual or personal capacity claims.

DATED:  March 31, 2023

_____
Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge

---

142 S. Ct. 2711 (2022); *Dittman v. California*, 191 F.3d 1020, 1027 (9th Cir. 1999) (statute or ordinance context); *see also Brown v. Mason*, 288 Fed.Appx. 391, 392-93 (9th Cir. 2008) ("Defendants are entitled to qualified immunity because they confiscated Brown's photographs pursuant to official prison policies, which policies were not 'patently violative of constitutional principles.'"); *Smyl, Inc. v. Gerstein*, 364 F. Supp. 1302, 1310–11 (S.D. Fla. 1973) (an officer cannot be "actionable for damages for the good faith enforcement of an allegedly overbroad statute which has not been invalidated"). *But see Grossman v. City of Portland*, 33 F.3d 1200, 1209-10 (9th Cir. 1994) ("Where a statute authorizes official conduct which is patently violative of fundamental constitutional principles, an officer who enforces that statute is not entitled to qualified immunity.").